## STATE OF CONNECTICUT v. CARLTON MARTIN (AC 22976)

Dranginis, Flynn and McDonald, Js.

Argued December 10, 2002—officially released July 8, 2003

*James B. Streeto*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom were *Patricia M. Froelich*, state's attorney, and, on the brief, *Walter D. Flanagan*, state's attorney, and *David R. Shannon*, assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, Carlton Martin, appeals from the judgments of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2) and five counts of tampering with a witness in violation of General Statutes § 53a-151. On appeal, the defendant claims that the trial court improperly (1) failed to recuse itself, (2) denied his motion to suppress certain letters and telephone call tapes, (3) refused to give a requested jury instruction on specific intent, (4) charged the jury as to consciousness of guilt, (5) denied his motion to suppress evidence pursuant to *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), and (6) denied him his constitutional right to present a defense as a result of certain evidentiary rulings. We affirm the judgments of the trial court.

The jury could have reasonably found the following facts. At 6 a.m., on January 18, 1999, the defendant called Nicole Harris and asked her to drive from Bridgeport to Danbury to pick up his cousin, Tommie L. Martin. At approximately 8:30 a.m., Harris and the defendant picked up Tommie Martin in Danbury. Harris then drove Tommie Martin and the defendant to a gasoline station located next to Gallo's Hi-Way Package Store (Gallo's) in Danbury. After filling Harris' brown Chevrolet Chevette with gas, Harris drove along the street, passing Gallo's, and turned onto the street next to Gallo's, where she parked. The defendant and Tommie Martin left Harris' vehicle and went toward Gallo's. After five minutes, the defendant and Tommie Martin returned to the vehicle and Tommie Martin told Harris to drive around the block. When the vehicle was in front of Gallo's, Tommie Martin told Harris to drive by slowly. As Tommie Martin peered into Gallo's, he said, "[h]e's by himself," and the defendant responded, "I have my heat on me, we'll go back in." Tommie Martin told Harris to turn her vehicle around and park next to Gallo's. The defendant and Tommie Martin left the vehicle and returned ten minutes later with bottles of E & J brandy. When they reentered the vehicle, Tommie Martin told Harris to drive onto the highway. While driving toward Bridgeport, the defendant and Tommie Martin talked excitedly and were asking each other, "[W]as it worth it?" Shortly thereafter, police were called to the liquor store, where they found the victim, Robert Gallo, lying motionless, having been shot multiple times. The cash register had been disturbed, and two bottles of E & J brandy were missing. Gallo died as a result of his injuries. The defendant subsequently told Harris that he and Tommie Martin were involved in the robbery and shooting at Gallo's.

On January 20, 1999, the defendant called Harris and told her to come to his apartment to pick up something.

When she arrived, the defendant handed Harris a shoebox containing a .25 caliber handgun wrapped in a towel. In March, 1999, Harris turned the gun over to the police, and ballistics tests confirmed that it had been used to fire the bullets that killed Gallo.

On January 25, 1999, the Danbury police department obtained a search warrant for the defendant's and Tommie Martin's residence at 2108 Seaview Avenue in Bridgeport. The police executed the warrant. The police seized a sawed-off shotgun, a box of .25 caliber ammunition, a .22 caliber firearm and a magazine for a .22 caliber firearm. Subsequent laboratory analysis of the bullets recovered from the victim's body and those in a box of .25 caliber cartridges found at the defendant's apartment revealed their chemical elements to be indistinguishable. They all had come from that box of ammunition.

While awaiting trial, the defendant attempted to contact Harris from prison and did contact associates of Harris to urge her not to cooperate with the state and to dispose of the .25 caliber handgun, which she had been hiding.

I

The defendant first claims that the court, *Carroll, J.*, improperly failed to recuse Judge White. We disagree.

The following facts are relevant to our resolution of the defendant's claim. At a pretrial hearing, Judge White had ordered Barbara Profit, the mother of Antoni Profit and Gregory "Trell" Profit, to leave the courtroom pursuant to a sequestration order. At that time, Barbara Profit, who was the defendant's aunt, recognized Judge White as the public defender who had represented her son, Antoni Profit, in 1995.

Antoni Profit, listed as a witness by the state, was the addressee of jail correspondence from the defendant,

which the state claimed showed that the defendant had sought to tamper with the witness, Harris. Gregory Profit also was listed by the state to be a witness to the sale of the murder weapon by Eugene Laurel to the defendant.

The defendant subsequently presented a motion asking Judge White to recuse himself. Judge White, after hearing arguments from the defendant and the prosecutor, stated: "I'll state for the record that I don't have any personal animus or dislike toward [the defendant] . . . . I never knew, saw or heard of any one of these individuals before this trial started. Insofar as Antoni Profit is concerned, after looking at the paperwork that was submitted to me, I would agree that I represented him as a public defender as long ago as 1996, over four years ago, and I do not have any independent memory of him. I don't remember any of the facts of his case. If he walked through that door right now, I wouldn't know who he was.

"Insofar as Barbara Profit is concerned, I have no independent memory of her. I have no personal dislike for her. When I ordered her sequestered, my ruling had nothing to do with her as an individual. I was told that she was a witness in this case, and as indicated by [the prosecutor], she was a participant and perhaps a subject of some of those telephone calls that we heard recorded and were submitted into evidence in the motion to suppress, and, apparently, she's going to be called at trial. My ruling had nothing to do with any thoughts or feelings about her as an individual. So, I would say I don't have any actual bias toward any of the parties or any of the witnesses in the case. And I understand the question is what an objective observer might think.

"Insofar as Antoni Profit's criminal history with the court is concerned or my representation of him is concerned, as far as I know, anything I represented him in

connection with has nothing, absolutely nothing to do with this case. . . . I think, under all the circumstances here, I don't think there's a basis for me to recuse myself. Nevertheless, I'm going to pass the matter, and I'm going to ask Judge Carroll to come up and listen to your arguments."

A hearing was then held before Judge Carroll. At the hearing, it was stipulated that Judge White, as a public defender, had represented Antoni Profit, a prospective state's witness, in one case involving two charges in 1995 and 1996. The state then told Judge Carroll that it no longer intended to call Antoni Profit as a witness.

The only witness at the hearing was Barbara Profit. Barbara Profit testified that Judge White had represented her son, Antoni Profit, in 1996, and that Judge White was not receptive to the information that she provided to him at that time. She testified that she believed that Judge White could not be fair in this case.

During Barbara Profit's testimony, she stated that another son, Gregory Profit, had been represented at some unspecified time by someone at the Norwalk public defender's office. That office was the one at which Judge White had worked. Barbara Profit also stated that she did not know if Judge White ever had represented Gregory Profit. Gregory Profit was anticipated to testify for the state that he had purchased the murder weapon from Laurel, and the defense claimed there was evidence that Gregory Profit had done so to commit a robbery with Laurel.

After the hearing, the court, *Carroll, J.*, denied the defendant's motion, ruling that "based upon all the evidence that is before me, and based upon my assessment of the credibility of the one [witness] who has testified, there is no evidence of any conduct that would lead a reasonable person, knowing all of the circumstances, to the conclusion that [Judge White's] impartiality might

reasonably be questioned." The defendant appeals from Judge Carroll's ruling, claiming that Judge White should have been disqualified because of the appearance of impropriety.

"Accusations of judicial bias or misconduct implicate the basic concepts of a fair trial. . . . The appearance as well as the actuality of [partiality] on the part of the trier will suffice to constitute proof of bias sufficient to warrant disqualification." (Internal quotation marks omitted.) *State* v. *Montini*, 52 Conn. App. 682, 694, 730 A.2d 76, cert. denied, 249 Conn. 909, 733 A.2d 227 (1999).

"The standard for such a determination is well established. The standard to be employed is an objective one, not the judge's subjective view as to whether he or she can be fair and impartial in hearing the case. In Connecticut, the disqualification of judges is governed by General Statutes § 51-39[1] and Canon 3 [c] of the Code of Judicial Conduct. Under Canon 3 [c] (1) of the Code of Judicial Conduct [a] judge should disqualify himself . . . in a proceeding in which his . . . impartiality might *reasonably* be questioned . . . . Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding clearly falls within the scope of the general standard . . . . The question is not whether the judge

---

[1] General Statutes § 51-39 (a) provides in relevant part: "Except as provided in this section, a judge . . . is disqualified to act if a relationship between the judge . . . and a party in any proceeding in court before him is as near as the degree of kinship between father and son, brothers, or uncle and nephew, by nature or marriage, or as near as between landlord and tenant, or if any judge . . . may be liable to contribute to the damages, costs or expenses of any proceeding before him, or if he may receive a direct pecuniary benefit by the determination of any proceeding before him."

is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his . . . impartiality, on the basis of all of the circumstances." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Shabazz*, 246 Conn. 746, 768–69, 719 A.2d 440 (1998), cert. denied, 525 U.S. 1179, 119 S. Ct. 1116, 143 L. Ed. 2d 111 (1999).

"The standard for appellate review of whether the facts require disqualification is whether the court's discretion has been abused. *Abington Ltd. Partnership* v. *Heublein*, [246 Conn. 815, 824, 717 A.2d 1232 (1998)]. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *Joyner* v. *Commissioner of Correction*, 55 Conn. App. 602, 609, 740 A.2d 424 (1999).

We conclude that the facts in this case do not present a situation in which a reasonable person would question Judge White's impartiality. Our Supreme Court, in *Bonelli* v. *Bonelli*, 214 Conn. 14, 570 A.2d 189 (1990), held that there was no cause to disqualify the trial judge. In that case, the trial judge, prior to his appointment to the bench, had been cocounsel in another matter with counsel for one of the parties. Id., 15. The Supreme Court looked to the "very limited" role of the judge in that association and the amount of time, fourteen months, that had elapsed after the association with counsel terminated. Id., 18. Examining the totality of the circumstances, our Supreme Court reversed this court's decision requiring disqualification. Id., 22. While stating that extensive business and professional relationships may require a different result, the court took into account "the realities of modern litigation" in refus-

ing to place a burden on the judicial system without "justification." Id.

In this case, Judge White had once represented Antoni Profit in Norwalk as a public defender in 1996, four years before the trial of this case. Antoni Profit was not a party to this prosecution, never appeared as a witness and Judge White stated that he had no recollection of him. Considering the practical realities of the very busy public defenders in urban geographical area courts, the fact that Antoni Profit's 1996 case had nothing to do with the defendant's case and the fact that Antoni Profit was not called as a witness by either party, we conclude that no reasonable person would find cause to question Judge White's impartiality on those grounds.

Our Supreme Court in *State* v. *Shabazz*, supra, 246 Conn. 769–70, found no appearance of bias in a case in which a judge presided over the trial of an African-American charged with murder, where the judge's father had been killed in a robbery by an African-American. The court rejected such a claim as being based on " 'raw speculation' " and not on a reasonable basis. Id., 769.

At the hearing on the motion to recuse, the defendant presented the testimony of Antoni Profit's mother, who claimed that Judge White might have animosity toward her and Antoni Profit. Barbara Profit testified that Judge White had ignored her when he was a public defender and that she believed that he could not be fair at this trial. Judge Carroll, after hearing her testify that she had first voiced her belief about Judge White after Judge White denied some defense motions, did not find her testimony credible. On appeal, the defendant now claims that a reasonable person might believe that Judge White's evidentiary rulings concerning Antoni Profit's conduct after the defendant contacted him were

influenced by the fact that he was formerly Antoni Profit's attorney. Just how those evidentiary rulings might assist Antoni Profit to avoid prosecution is not spelled out by the defendant, nor is it at all apparent in the record. We conclude that any claim of partiality is based on speculation.

With respect to Gregory "Trell" Profit, although he did appear as a witness and the defendant did attempt to fasten responsibility for the Gallo murder on him, Judge White had never represented him, although someone in the Norwalk public defender's office had done so at some time in the past.

There is no claim that Gregory Profit's Norwalk case had anything to do with the matter on trial. See canon 3 (c) (1) (requiring disqualification if judge, or one with whom judge previously practiced law, represented someone in the matter in controversy); *National Auto Brokers Corp.* v. *General Motors*, 572 F.2d 953, 958 n.9 (2d Cir. 1978) (discussing disqualification under 28 U.S.C. § 144), cert. denied, 439 U.S. 1072, 99 S. Ct. 844, 59 L. Ed. 2d 38 (1979). The defendant claims that Judge White's partiality might reasonably be questioned because Judge White "may have gleaned other information" about Gregory Profit that "could or would" influence him. That is raw speculation, which our Supreme Court has held does not support recusal. *State* v. *Shabazz*, supra, 246 Conn. 769; *State* v. *Montini*, supra, 52 Conn. App. 695.

Absent any knowledge of Gregory Profit on the part of Judge White and the reality, in the words of the defendant's counsel at trial, that thousands of defendants may be represented by a public defender's office, we find no justification to require Judge White's recusal. Furthermore, although Barbara Profit testified that someone in the Norwalk public defender's office had once represented Gregory Profit, the defendant failed

to prove that Judge White worked with that office at that time. See *United States* v. *Barth*, No. Crim. N-90-SAHN, 1996 U.S. Dist. WL 684396 (D. Conn. October 10, 1996). Finally, Judge White never was informed of that as a basis to recuse himself, and Judge Carroll never was informed that the defendant would testify that he saw Gregory Profit leaving Gallo's on the morning of the homicide. One seeking to disqualify a judge must establish the facts supporting such a need. See *State* v. *Montini*, supra, 52 Conn. App. 695. That was not done in this case.

In support of his claim, the defendant relies on *Dubaldo* v. *Dubaldo*, 14 Conn. App. 645, 542 A.2d 750 (1988), and *Ford* v. *Ford*, 52 Conn. App. 522, 727 A.2d 254 (1999). We concluded in both of those cases that the trial judge should have been disqualified because of relationships between the trial court and a witness.

In *Dubaldo* v. *Dubaldo*, supra, 14 Conn. App. 646–47, after an attorney-witness testified at a dissolution proceeding, the trial court declared a recess and called the attorney-witness into chambers for an ex parte meeting. After the meeting, the judge stated that she had " 'sympathies' " for the attorney-witness and that she had "known the [attorney-witness] for a while. I know this practice can be devastating to people and I think some words from people are helpful sometimes." (Internal quotation marks omitted.) Id., 647. In finding an appearance of impropriety, we stated that "[t]he question presented here is not whether the judge could render an impartial decision, but *whether [an] ex parte discussion with the witness* immediately following his testimony created in the minds of observers, particularly the defendant, an appearance of impropriety." (Emphasis added.) Id., 650.

In *Ford* v. *Ford*, supra, 52 Conn. App. 522, the trial judge had stated in a prior case involving the attorney

who was to be the defendant's chief witness: "I'm going to recuse myself from all of your matters . . . [b]ecause I do not approve of the way you handle yourself." (Internal quotation marks omitted." Id., 524. We concluded that the court improperly failed to grant the motion for recusal and that a reasonable person, knowing all the circumstances, might question the judge's impartiality regarding the witness, about whom the judge had "critical and adverse feelings." Id., 531.

In this case, Judge White did not have any negative feelings about any witnesses. On the contrary, Judge White had no recollection of Antoni Profit, Gregory Profit or Barbara Profit, nor did he have any contact with them, except Antoni Profit, who did not become a witness. Furthermore, both *Dubaldo* and *Ford* involved court trials in which the judge was to pass on the credibility of the witnesses. No such claim can be made in this case, which was tried to the jury. In this case, the jury alone would pass on the credibility of the witnesses.

The proof in this case did not rise to the level that would lead a reasonable person to question Judge White's impartiality. The circumstances were that more than four years had passed since Judge White's representation of Antoni Profit, who did not appear as a witness, the past representation of Gregory Profit by the Norwalk public defender's office did not relate to the charges against the defendant, and Judge White had no recollection of Antoni Profit, Gregory Profit and Barbara Profit. We conclude that no reasonable person, knowing all the circumstances, would question Judge White's impartiality in presiding over the defendant's case. See *Rowan Construction Corp.* v. *Hassane*, 17 Conn. App. 71, 76–77, 549 A.2d 1085 (1988), aff'd, 213 Conn. 337, 567 A.2d 1210 (1990). Accordingly, we do not find that Judge White was required to be disqualified.

## II

The defendant claims that the court improperly denied his motion to suppress letters and telephone calls he originated from prison. As a pretrial detainee, the defendant contends that his fourth amendment rights were violated because the department of correction's reading of his outgoing mail and recording of his telephone calls were not required for reasons of prison security. We disagree.

Prior to trial, the court held a hearing on the defendant's motion to suppress. After the hearing, the court made the following findings: "Officer Raphael Santiago is a department of correction employee and has been so for at least ten years. In the calendar year 1999, he worked as a communications enforcement officer and telephone monitoring officer. His responsibilities included listening to inmate phone calls and reviewing nonprivileged prisoner mail. The purpose of the review of mail and telephone calls is to maintain security, control gang activity and conduct ongoing investigation into criminal activity, among other purposes. The department of correction's regulations and policy allow for the monitoring of nonprivileged phone calls and nonprivileged mail. When I say nonprivileged, I'm referring to phone calls and mail that is not directed to an attorney for the purpose of obtaining legal advice. This monitoring of phone calls and mail is done on either a random or targeted basis.

"When a person is newly admitted into the correction system, whether it's [the MacDougall-Walker Reception/Special Management Unit (Walker)], where the defendant is and was incarcerated, or at some other facility, the newly admitted inmate is given a handbook which notifies him of the phone call and mail monitoring system. An inmate must sign and—the inmate must sign a receipt that acknowledges that they received the

handbook and he understands that the phone calls will be monitored. The defendant in this case, Carlton Martin, received a handbook, and signed and received the acknowledgement forms.

"There are signs above the pay phones in Walker and the other Connecticut institutions, and these signs indicate that the phone calls made from these telephones are subject to monitoring by prison authorities and that the prisoners are permitted to make collect phone calls and that these phone calls have to be made using a personal identification number, or PIN, and also the prisoner's person identification number, and when the prisoner is using the telephone, there is a computerized voice which announces at both ends of the telephone call that the call is being monitored and that the call is made by a Connecticut prison inmate. Additionally, there is an audible beep which occurs every fifteen seconds for the purpose of reminding the parties on the phone that the telephone call is being monitored.

"Now, during the course of his duties, Officer Santiago reviewed phone calls and mail of the defendant, and Santiago read . . . a letter dated March 14, 1999, written by the defendant, and Santiago faxed a copy of that letter to inspector Richard Lindberg of the Danbury state's attorney's office. . . . Officer Santiago faxed the March 14, 1999 letter because he believed that was relevant to the investigation, the ongoing investigation of criminal activity. Santiago acted upon a directive given to him by a supervisor, Bill Grady, the director of security at Walker.

"Santiago contacted inspector Lindberg regarding the March 14, 1999 letter and asked him to secure a search warrant for the original of the March 14, 1999 letter. Lindberg secured a search warrant for that letter on March 18, 1999, and that search warrant was signed by a judge of the Superior Court. When Lindberg executed

the March, 1999 search and seizure warrant, he received from Santiago, in addition to the original, handwritten letter of March 14, 1999, three photocopies of letters not specified in the search warrant. Those three letters included two handwritten letters dated March 16, 1999, and one handwritten letter dated March 17, 1999. Now, all four of the letters that I referred to were written by the defendant to Chantay Gibson, and the contents of each included information about the Gallo murder investigation or discussed efforts to influence witnesses in the murder case pending against the defendant . . . .

"Santiago gave Lindberg the March 16 and March 17, 1999 photocopy letters as part of the ongoing investigation into the Gallo murder and robbery, but allowed the original letters to go to the addressee. As part of the ongoing investigation . . . . Santiago reviewed a fifth letter, dated June 23, 1999, and that letter was written by the defendant to a Tony Profit. After reviewing the letter, Santiago faxed a copy of that letter to investigator Lindberg, who, in turn, sought and secured a search warrant for the June 23, 1999 letter. The search warrant is signed by a judge of the Superior Court and dated June 29, 1999.

"As part of the ongoing investigation, Santiago listened to and recorded outgoing collect phone calls made by the defendant between February 2, 1999, and March 22, 1999, and also listened to and recorded collect phone calls made by the defendant between March 23, 1999, and April 9, 1999. . . . The contents of at least eleven of these calls consist of attempts to influence witnesses in the pending murder case against the defendant or information about the alleged crime. The taped phone calls made by the defendant on the period of February 2, 1999, were seized pursuant to a search warrant signed by a judge of the Superior Court on March 22, 1999. The taped phone calls made by the defendant between March 23, 1999, and April 9, 1999,

were seized pursuant to a search warrant signed by a judge of the Superior Court on April 9, 1999."

In denying the motion to suppress, the court held that Walker's regulations allowed authorities to monitor all nonprivileged telephone calls and letters, and, as such, the defendant did not have a reasonable expectation of privacy. The court found that one of the purposes of those regulations to maintain prison security was to promote ongoing investigations into possible criminal activity. The court found that the defendant's outgoing mail and telephone calls were connected to ongoing criminal activity. It concluded that Officer Santiago, in his monitoring, had come across information that appeared to be connected with ongoing criminal activity, which consisted of tampering with a witness. Alternatively, the court ruled that if a search warrant was required, there was a warrant obtained for the March 14, 1999 letter and that the three additional letters that Santiago turned over when the warrant was executed fell under the plain view exception to the warrant requirement.

The following additional facts are relevant to our resolution of that issue. Following the defendant's arrest, he was held in lieu of bond at Walker in Suffield. Upon arrival, the defendant was provided with the "Walker R.S.M.U. Inmate Handbook." The handbook states that it "provides information about the Department of Correction and the operation of this facility" and that its information "does not supersede or overrule [Regs., Conn. State Agencies §§] 18-81-28 through 18-81-38 and 18-81-51 in any way." The handbook states that "[i]nmate use of mail is governed by [Regs., Conn. State Agencies §§] 18-81-28 through 18-81-38 and 18-81-51," and that "[t]he Warden may place your mail under review, which includes reading, if the Warden has reason to believe that such reading is generally necessary to further the substantial interests of security, order or

rehabilitation." The handbook also provides that correspondence that contains or concerns criminal activity or things written in code may be rejected and result in criminal proceedings. In addition, the handbook provides that "inmate use of the telephones is governed by [Regs., Conn. State Agencies §§] 18-81-28/29 and 18-81-41 through 18-81-51," and that inmates' "telephone conversations are subject to being recorded and listened to." The handbook also states that it does not supersede or overrule those regulations. On February 2, 1999, the defendant signed a form acknowledging that he had been advised of the department of correction's regulations pertaining to mail and telephone communications.[2]

[2] Several state regulations are applicable. Section 18-81-29 of the Regulations of Connecticut State Agencies provides: "Inmate communications by mail and by telephone may be inspected, reviewed, read, listened to, recorded, restricted, or prohibited in accordance with the provisions of Sections 18-81-28 through 18-81-51, inclusive, of the Regulations of the Connecticut State Agencies."

Section § 18-81-31 (a) of the Regulations of Connecticut State Agencies provides in relevant part: "All outgoing general correspondence shall be subject to being read at the direction of the Unit Administrator, by person(s) designated in writing by such Administrator, for either a specific inmate(s) or on a random basis if the Commissioner or Unit Administrator has reason to believe that such reading is generally necessary to further the substantial interests of security, order or rehabilitation. Outgoing general correspondence may be restricted, confiscated, returned to the inmate, retained for further investigation, referred for disciplinary proceedings *or forwarded to law enforcement officials*, if such review discloses correspondence or materials which contain or concern . . .

"(3) Plans for activities in violation of facility or departmental rules.

"(4) *Plans for criminal activity.*

"(5) Violations of Sections 18-81-28 through 18-81-51, inclusive, of the Regulations of the Connecticut State Agencies or unit rules.

"(6) Information which if communicated would create a clear and present danger of violence and physical harm to a human being. . . .

"(9) Threats to the safety or security of staff, other inmates, or the public. . . ." (Emphasis added.)

Section 18-81-41 of the Regulations of Connecticut State Agencies provides: "Each Facility Administrator shall provide 'collect call only' telephones which allow for outgoing calls in areas specified by the Unit Administrator for inmate use. Schedules and terms for telephone use shall

Before the defendant was arrested on February 1, 1999, in connection with the Gallo homicide, Harris had decided to cooperate with the police. Harris gave the police a signed, sworn statement as to the defendant's involvement in the Gallo robbery and murder on Janu-

be posted in telephone areas. Inmate use of 'collect call only' telephones shall be deemed a privilege and not an entitlement. Use of any telephone may be prohibited by the Facility Administrator to meet any valid penological interest. If the call is to an attorney, such prohibition shall be based upon a determination relating to the maintenance of security, safety or orderly operation of the facility. The availability or use of any telephones may be restricted or terminated at the discretion of the Commissioner or designee. Credit card calls, billing to a third party, call forwarding, transfers or any other method which circumvents collect call billing shall be prohibited."

Section 18-81-44 of the Regulations of Connecticut State Agencies provides: "Only telephone calls from 'collect call only' telephones may be recorded and listened to provided the following provisions are complied with:

"(a) Notification. A sign in English and Spanish shall be posted at each inmate telephone location which reads: 'Any conversation utilizing these telephones shall be subject to recording and listening.' Upon admission, each inmate shall be given a form stating that the inmate's telephone calls are subject to recording and listening. The inmate shall acknowledge reading the form by a legible printed name and signature or by an appropriate assent acknowledged in writing by a staff member. Any inmate not so consenting shall not be allowed use of the 'collect call only' telephones and shall be instructed that any such use shall be unauthorized and in violation of institutional rules.

"(b) Automatic Tone Warning. Inmate telephone calls shall be recorded in accordance with the provision of Section 52-570d of the Connecticut General Statutes and any other applicable law. No call shall be recorded unless the recording is accompanied by an automatic tone warning device which automatically produces a distinct signal that is repeated at intervals of approximately 15 seconds during the communication while such instrument, device or equipment is in use.

"(c) Listening. Listening shall be authorized only by the Unit Administrator or higher authority when there is reason to believe that such listening is reasonably related to the maintenance of the security, good order or discipline of the facility or the prevention of criminal activity either within the facility or without."

Section 18-81-50 of the Regulations of Connecticut State Agencies provides: "Upon admission, each inmate shall be given a form which states, 'I have been advised that the Commissioner of Correction has adopted regulations pertaining to mail and telephone use and that these regulations are contained in Sections 18-81-28 through 18-81-51 of the Regulations of

ary 18, 1999, and thereafter the police sought an arrest warrant for the defendant. A probable cause hearing for the defendant was scheduled for March 23, 1999, at which Harris was to be a witness. Harris also was hiding the murder weapon, which the defendant had given to her on January 20, 1999. She subsequently turned that weapon over to the police in March, 1999.

After the defendant arrived at Walker, the head of Walker's security division gave Officer Santiago, the facility's telephone monitor, a written directive to monitor the defendant's communications and writings as part of an ongoing investigation. Thereafter, Santiago reviewed the letters that the defendant sent from the facility and the nonprivileged telephone calls that he initiated. The intercepted mail communications all related to efforts by the defendant to have Harris change her testimony or make it unavailable. On the tapes of the telephone calls, there was reference to disposing of the murder weapon.

On March 23, 1999, the defendant was arrested and charged with four counts of tampering with a witness. Subsequently, on June 24, 1999, the defendant wrote a letter to Antoni Profit, in which he urged Antoni Profit to contact Harris through her father because she had relocated and could not be contacted by the defendant or Antoni Profit directly.[3]

"As a preliminary matter, we set forth the standard of review. Our standard of review of a trial court's

Connecticut State Agencies.' The inmate shall acknowledge reading the form by signature."

Section 18-81-51 of the Regulations of Connecticut State Agencies provides: "Information obtained from correspondence and/or telephone calls by correctional staff, pursuant to the provisions of these regulations, shall be disclosed only as reasonably necessary to promote legitimate penological, law enforcement or *public safety purposes.*" (Emphasis added.)

[3] The defendant was charged with a fifth count of tampering with a witness for that action.

findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Yusuf*, 70 Conn. App. 594, 603, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d 1064 (2002). In this case, the defendant challenges the court's legal conclusion that he did not have a privacy interest in his outgoing mail and telephone calls under the fourth amendment to the United States constitution.

"To receive fourth amendment protection against unreasonable searches and seizures, a defendant must have a legitimate expectation of privacy in the [subject of the search]. . . . Absent such an expectation, the subsequent police action has no constitutional ramifications. . . . The determination of whether the defendant had a reasonable expectation of privacy in the [subject of the search] requires a two part factual inquiry: first, whether the defendant has exhibited an actual subjective expectation of privacy; and second, whether that expectation is one that society is prepared to recognize as reasonable." (Internal quotation marks omitted.) *State* v. *Russo*, 259 Conn. 436, 441 n.7, 790 A.2d 1132, cert. denied, 537 U.S. 879, 123 S. Ct. 79, 154 L. Ed. 2d 134 (2002).

Our Supreme Court, in *Washington* v. *Meachum*, 238 Conn. 692, 725, 680 A.2d 262 (1996), rejected a claim by convicted prisoners and pretrial detainees that the review of nonprivileged outgoing mail, and the monitoring and recording of nonprivileged inmate telephone conversations by prison personnel violated our state constitution. In *Washington*, our Supreme Court recog-

nized that the federal courts consistently have concluded that the limited privacy rights of inmates do not include the right to make unmonitored nonprivileged telephone calls. Id., 717, citing *United States* v. *Workman*, 80 F.3d 688, 694 (2d Cir.), cert. denied sub nom. *Rodgers* v. *United States*, 519 U.S. 938, 117 S. Ct. 319, 136 L. Ed. 2d 233, cert. denied sub nom. *Green* v. *United States*, 519 U.S. 955, 117 S. Ct. 373, 136 L. Ed. 2d 262 (1996). Quoting *United States* v. *Sababu*, 891 F.2d 1308, 1329 (7th Cir. 1989), our Supreme Court observed that there is no reasonable expectation of privacy in prison, where "official surveillance has traditionally been the order of the day." (Internal quotation marks omitted.) *Washington* v. *Meachum*, supra, 718. The court in *Washington* also held that such an expectation is not one that society is prepared to recognize as reasonable. Id., 724.

The *Washington* court also rejected the claim that the reading of inmates' nonprivileged outgoing mail violated the first and fourteenth amendments to the federal constitution. Such interception is authorized under the department of correction's regulations, which authorized the monitoring if it were needed to "further the substantial interests of security, order or rehabilitation." (Internal quotation marks omitted.) Id., 725. Quoting the United States Supreme Court's decision in *Procunier* v. *Martinez*, 416 U.S. 396, 413, 94 S. Ct. 1800, 40 L. Ed. 2d 224 (1974), our Supreme Court observed that "the most obvious example of justifiable censorship of prisoner mail would be refusal to send . . . letters concerning escape plans or containing other information concerning proposed criminal activity." (Internal quotation marks omitted.) *Washington* v. *Meachum*, supra, 238 Conn. 728.

In this case, the defendant was notified upon his arrival at Walker that his telephone calls would be

recorded and that his mail would be read.[4] The defendant has failed to cite any authority, nor have we found any, for the proposition that a pretrial detainee has a reasonable expectation of privacy in his telephone calls and mail *after* being informed that his calls and mail would be monitored. See *United States* v. *Willoughby*, 860 F.2d 15, 20–21 (2d Cir. 1988), cert. denied, 488 U.S. 1033, 109 S. Ct. 846, 102 L. Ed. 2d 978 (1989).

When the defendant received a copy of Walker's handbook and signed the form acknowledging that he had read the institution's policies, he was on notice that his mail and telephone calls were being monitored. We conclude that the defendant did not have an objectively reasonable expectation of privacy. See *United States* v. *Workman*, supra, 80 F.3d 693–94. Without an expectation of privacy, the fourth amendment's warrant requirements do not apply. *State* v. *Russo*, supra, 259 Conn. 441 n.7.

In support of his argument that he had an expectation of privacy as to his nonprivileged outgoing mail and telephone calls as an unsentenced inmate, the defendant principally relies on *United States* v. *Cohen*, 796 F.2d 20 (2d Cir.), cert. denied, 479 U.S. 854, 107 S. Ct. 189, 93 L. Ed. 2d 122 (1986).[5] In *Cohen*, while the defendant was held in lieu of bond awaiting trial, an assistant United States attorney instructed a correction officer to perform a warrantless search of the defendant's cell. Id., 21. The purpose of the search was "to look for certain types of documents that may have con-

---

[4] The defendant subsequently testified at the trial that he was aware his telephone calls were being recorded.

[5] In addition to *United States* v. *Cohen*, supra, 796 F.2d 20, the defendant relies on *United States* v. *Rollack*, 90 F. Sup. 2d 263 (S.D.N.Y. 1999), *State* v. *Twyman*, 2001 Del. Super. LEXIS 305 (2001), *McCoy* v. *State*, 639 So. 2d 163 (Fla. App. 1994), *State* v. *Henderson*, 271 Ga. 264, 517 S.E.2d 61 (1999), cert. denied, 528 U.S. 1083, 120 S. Ct. 807, 145 L. Ed. 2d 680 (2000), and *State* v. *Jackson*, 321 N.J. Super. 365, 729 A.2d 55 (1999).

tained the names and phone numbers of other of [the defendant's] co-conspirators and witnesses who [the defendant] had already contacted and was still in the process of trying to contact." (Internal quotation marks omitted.) Id. The United States Court of Appeals for the Second Circuit found that the defendant had an expectation of privacy in his cell when the search was not initiated by an objective prison administrator for the purpose of insuring prison security. Id., 24.

In *Willis* v. *Artuz*, 301 F.3d 65, 66 (2d Cir. 2002), detectives investigating a homicide asked prison officials to search the cell of the convicted defendant without a search warrant. The Second Circuit found that the defendant, as a convicted inmate, did not have an expectation of privacy in the contents of his cell. Id. The court observed that *Cohen* stands for the proposition that "a pre-trial detainee does retain Fourth Amendment protection against searches at the instigation of non-prison officials for non-institutional security related reasons." (Internal quotation marks omitted.) Id., 68.

The defendant's reliance on *Cohen* as to outgoing telephone calls and mail is misplaced. In *United States* v. *Willoughby*, supra, 860 F.2d 21, citing *Bell* v. *Wolfish*, 441 U.S. 520, 546, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979), the Second Circuit refused to extend the residual fourth amendment privacy interests of pretrial detainees enunciated in *Cohen* to the taping and monitoring of outgoing prison telephone calls. The court held that practices such as the monitoring of nonprivileged telephone calls do not rise to the level of an unreasonable invasion of the privacy rights of pretrial detainees. *United States* v. *Willoughby*, supra, 21.

In *Cohen*, the court held that an expectation of privacy existed in the prisoner's cell when the warrantless

search was conducted for nonsecurity reasons. See id., 19–20. In this case, the monitoring was part of an ongoing investigation into ongoing criminal activity. In *United States* v. *Workman*, supra, 80 F.3d 692, prison administrators recorded inmate telephone calls and sent them to law enforcement officials for use in an ongoing investigation into narcotics trafficking. The *Workman* court rejected any claim of a fourth amendment violation, citing *United States* v. *Willoughby*, supra, 860 F.2d 19–20, and finding that inmates are deemed to have given consent to the recording of their telephone calls from prison. *United States* v. *Workman*, supra, 693.

The Second Circuit in *Workman* also rejected such a claim concerning the interception of prison mail, citing *Turner* v. *Safley*, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987), and noting that the restriction of inmate privacy interests is justified to the extent that it is reasonably related to legitimate penological interests. *United States* v. *Workman*, supra, 80 F.3d 698. The court held that the "investigation and prevention of ongoing illegal inmate activity constitutes legitimate penological objectives. See *Thornburgh* v. *Abbott*, 490 U.S. 401, 411–12, 109 S. Ct. [1874, 104 L. Ed. 2d 459 (1989)] (noting that [d]angerous outgoing correspondence in prison context posing a serious threat to prison order and security include plans relating to ongoing criminal activity)." (Internal quotation marks omitted.) *United States* v. *Workman*, supra, 699. The Second Circuit observed that "the absence of ready alternatives is evidence of the reasonableness of the prison's practice." (Internal quotation marks omitted.) Id.

In this case, the mail watch was founded, as in *Workman*, on the reasonable suspicion that the defendant might be engaged in criminal conduct. The police or the office of the state's attorney was engaged in an

ongoing investigation of a robbery and murder in which Harris, as a close friend of the defendant, had driven him and his cousin to and from the scene of the Gallo shooting. Harris had been involved with the defendant's friends and associates and now was the principal state's witness against the defendant. She was vulnerable to being contacted by the defendant or his associates to change her testimony. As a result, Harris had relocated when she began cooperating with the police. The prison authorities were informed that there was an ongoing investigation and instituted the mail watch. The defendant's prison telephone calls recorded since February 2, 1999, when he was first incarcerated, revealed that he had used his girlfriend, Gibson, to place third party calls directed to Harris at her place of employment in attempting to prevent her from testifying against him. While the surveillance was ongoing, the office of the state's attorney executed four search warrants for the tapes of the telephone calls and the mail, and obtained an arrest warrant for tampering with a witness.[6] Under those circumstances, the prison authorities had good or reasonable grounds to suspect that the defendant was committing ongoing criminal activities, such as witness tampering, and to inspect nonprivileged mail. See *United States* v. *Felipe*, 148 F.3d 101, 108 (2d Cir.), cert. denied, 525 U.S. 907, 119 S. Ct. 246, 142 L. Ed. 2d 202 (1998). In that respect, we should accord heightened deference to prison officials' policies designed to address the urgent problems involved in administering a modern day prison. See *Turner* v. *Safley*, supra, 482 U.S. 84–85; *Duamutef* v. *Hollins*, 297 F.3d 108, 112–13 (2d Cir. 2002).

We, accordingly, uphold the court's denial of the defendant's motion to suppress.

---

[6] The court was asked to take judicial notice of the warrants.

## III

The defendant next claims that the court improperly refused to give a requested instruction to the jury on specific intent.[7] We disagree.

The defendant makes the same claim that was rejected by our Supreme Court in *State* v. *Kurvin*, 186 Conn. 555, 442 A.2d 1327 (1982), which is that the court's use of the word "purpose," as opposed to "intent," deprived him of a constitutionally adequate jury charge. "[T]his court will not reexamine or reevaluate Supreme Court precedent. Whether a Supreme Court holding should be reevaluated and possibly discarded is not for this court to decide." (Internal quotation marks omitted.) *State* v. *Beverly*, 72 Conn. App. 91, 105, 805 A.2d 95, cert. denied, 262 Conn. 910, 810 A.2d 275 (2002). Accordingly, in accordance with *State* v. *Kurvin*, supra, 555, we conclude that the court did not improperly charge the jury on the element of specific intent relative to the charge of robbery in the first degree.

## IV

The defendant next claims that the court improperly charged the jury on consciousness of guilt. Specifically, the defendant contends that the court's consciousness of guilt instruction was improper because it did not

---

[7] In charging the jury, the court gave the statutory definition of robbery, stating that General Statutes § 53a-133 "of the Penal Code defines robbery as follows: A person commits robbery when in the course of committing a larceny he uses or threatens the immediate use of physical force upon another person for the purpose of (1) preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking, or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny. The gist of the crime of robbery is the act of committing a larceny by force or the threat of force. A person commits larceny when with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."

include language to the effect that flight or evasive conduct might be caused by reasons other than guilt of the crime charged and that feelings of guilt are present in many individuals who are not actually guilty of the crimes charged. We disagree.

In his reply brief, the defendant concedes that the issue is controlled by our Supreme Court's decisions in *State* v. *Figueroa*, 257 Conn. 192, 196–97, 777 A.2d 587 (2001), *State* v. *Hines*, 243 Conn. 796, 812–13, 816, 709 A.2d 522 (1998), and *State* v. *Freeney*, 228 Conn. 582, 593–94, 637 A.2d 1088 (1994). In *State* v. *Figueroa*, supra, 196–97, our Supreme Court, in rejecting an invitation to exercise its supervisory powers to bar jury instructions on consciousness of guilt stated: "[Consciousness of guilt] is a form of circumstantial evidence. Generally speaking, all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence of [consciousness of guilt] inadmissible but simply constitutes a factor for the jury's consideration. . . . The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make an instruction on [consciousness of guilt] erroneous. . . . Moreover, [t]he court was not required to enumerate all the possible innocent explanations offered by the defendant." (Internal quotation marks omitted.) Id.

Accordingly, we conclude that the court did not improperly charge the jury on consciousness of guilt.

V

The defendant next claims that the court improperly denied his motion to suppress evidence in accordance with *Franks* v. *Delaware*, supra, 438 U.S. 154. We disagree.

Prior to trial, the defendant sought to have suppressed items that were seized from his apartment on January 25, 1999, pursuant to a search warrant. The following facts are relevant to our resolution of that issue. On January 25, 1999, Detectives Daniel Trompetta and Craig Martin of the Danbury police department applied for a warrant to search the defendant's apartment on Seaview Avenue in Bridgeport for evidence pertaining to the Gallo homicide. That evidence was specified to be a Titan .25 caliber semiautomatic handgun with a serial number of "ED51843," .25 caliber ammunition, a white and gray winter camouflaged outer garment, and "puffy" jackets. In their affidavit, the detectives set forth the death of Gallo from gunshot wounds, the witness statements that two men wearing the described clothing were at Gallo's, and another witness' description of a brownish Chevette with a damaged rear quarter panel with Connecticut license plates, which was running poorly, parked next to Gallo's at the time of the shooting.

The affidavit stated that .25 caliber shell casings and two projectiles were found at Gallo's. One of those shell casings was fired from the same firearm used to shoot a Norwalk variety store employee during a robbery on January 3, 1999. A witness described the Norwalk suspects as "light skinned" and "medium to light skinned" black males.

The Titan handgun had been stolen in 1997 and after it was recovered, it was submitted to the forensic laboratory. The handgun was stolen again in 1998 and later identified as the Gallo homicide weapon. According to Armando Serrano, who had the gun after it was stolen in 1998, it was stolen from him by Laurel. Jamie LaFontaine, the ex-girlfriend of Laurel, informed the affiants that Laurel had stolen the gun from Serrano and sold it to Gregory Profit around New Year's Eve, 1998.

Randi Kimbel, Gregory Profit's girlfriend, told the detectives she was with Gregory Profit on New Year's Eve in 1998. At that time, Gregory Profit was driving Harris' poorly running vehicle with a dented left fender, and they went with Denis Fulton to Danbury to purchase a handgun from Laurel. The gun was purchased to give to the defendant, Tommie "Tee" Martin and Fulton, who were involved in the Bridgeport drug trade. According to Kimbel, the .25 caliber weapon was purchased as protection for the drug business at the Seaview Avenue address.

The affidavit set forth the following additional facts. In Norwalk, at Gregory Profit's mother's house on New Year's Eve in 1998, the defendant, Tommie Martin and Fulton attempted to test fire the weapon, but there was a problem with the magazine. On the Sunday following New Year's Day, the defendant was wearing gray and white camouflage, and he left with Tommie Martin and Fulton, returning a short time later. For several days thereafter, according to Kimbel, Gregory Profit was extremely upset and stressed, and finally told Kimbel that the defendant had shot someone in the head at a Norwalk variety store with the gun Profit gave the defendant, Tommie Martin and Fulton. Kimbel also told the detectives that the defendant, Tommie Martin and Fulton stayed at the premises to be searched and they, as well as Gregory Profit, used Harris' Chevette, which often was in Danbury. The affiants noted that the clothing, vehicle and firearm descriptions were not public information.

The defendant contends that the warrant's affidavit contained misstated material facts and omitted other material facts. Accordingly, under *Franks* v. *Delaware*, supra, 438 U.S. 154, the defendant had claimed that the court should have held a hearing to determine whether the affidavit contained materially misstated facts and omitted other material facts.

At the hearing on the motion, the court initially assumed that the defendant had made a preliminary showing that there were false statements that were knowingly, intentionally or recklessly put in, or other material facts omitted from, the search warrant, and asked the defendant to specify how probable cause was lacking if the court were to delete the false statements and add the other material facts.

The defendant made the following representations to the court to establish that probable cause was lacking for the search warrant because certain representations were omitted from the affidavit: (1) an individual who lived across the street from Gallo's saw two light skinned black males walking toward the store and then walking away carrying a couple of bottles of liquor on the morning of the homicide; (2) an individual present at Gallo's observed two males, one of whom she recognized as Ezra "Pooh" Stanton, at Gallo's near the time of the shooting, and later saw Stanton and a light skinned Hispanic male getting into a vehicle; (3) the victim of the Norwalk shooting, where the same gun was used, identified another individual as the person who had shot him; (4) LaFontaine told police that Laurel had sold the gun to "a Chuck" who has "a brother, Pooh;" and (5) Kimbel, Gregory Profit's girlfriend and the mother of his children, had a motive to lie to the police as to the facts set forth in the affidavit.

The court then asked the defendant to make a preliminary showing as to false statements that he alleged were included intentionally or recklessly in the warrant and material information that he alleged was omitted intentionally from the warrant. The defendant offered several exhibits to support his representations. The court then found that the defendant had failed to make a substantial preliminary showing that false material statements were knowingly and intentionally, or in reckless disregard for the truth, added to, or that mate-

rial statements were omitted from, the warrant, resulting in a lack of probable cause. In doing so, the court denied the defendant's motion for a *Franks* hearing.

"In order for a defendant to challenge the truthfulness of an affidavit underlying a warrant at a *Franks* hearing, he must: (1) make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit; and (2) show that the allegedly false statement is necessary to a finding of probable cause. . . . If the allegedly false statement is set aside, however, and there remains sufficient evidence to establish probable cause, a *Franks* hearing is not necessary. . . . Although the *Franks* decision referred only to false statements in the affidavit, we have held that material omissions from such an affidavit also fall within the rule. . . . As the Supreme Court noted in *Franks*, '[t]here is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory . . . . There must be allegations of deliberate falsehood or of reckless disregard for the truth . . . .' " (Citation omitted; internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 363–64, 796 A.2d 1118 (2002).

"[T]he test for determining whether an affiant's statements were made with reckless disregard for the truth is not simply whether the affiant acknowledged that what he . . . reported was true, but whether, viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his . . . statements or had obvious reasons to doubt the accuracy of the information he . . . reported." (Internal quotation marks omitted.) *State* v. *Thatcher*, 71 Conn. App. 516, 526,

802 A.2d 908, cert. denied, 261 Conn. 940, 808 A.2d 1134 (2002).

"Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on [that] issue, therefore, is subject to plenary review on appeal. . . . Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched. . . . Probable cause, broadly defined, [comprises] such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . Reasonable minds may disagree as to whether a particular affidavit establishes probable cause. . . .

"In determining the existence of probable cause to search, the magistrate should make a practical, commonsense decision whether, given all of the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. . . . In making this determination [of probable cause], the magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate." (Citations omitted; internal quotation marks omitted.) *State* v. *Pappas*, 256 Conn. 854, 864–65, 776 A.2d 1091 (2001).

The defendant's argument is that if certain information was included in the affidavit, a finding of probable

cause would not have been made. "Not all omissions, however, even if intentional, will invalidate an affidavit. . . . In fact, an affiant may omit facts that he believes to be either immaterial or unsubstantiated. . . . Thus, before a defendant is entitled to a *Franks* hearing for an alleged omission, he must make a substantial preliminary showing that the information was (1) omitted with the intent to make, or in reckless disregard of whether it made, the affidavit misleading to the issuing judge, and (2) material to the determination of probable cause. . . . Even if the affiant picks and chooses the information that he includes in the affidavit, there is no *Franks* violation if, had the magistrate been so advised, he still would have been justified in issuing the warrant." (Citations omitted; internal quotation marks omitted.) *State* v. *Bergin*, 214 Conn. 657, 666–67, 574 A.2d 164 (1990).

After our careful review of the record, we conclude that the court properly found that the police did not intentionally and knowingly omit material facts from the affidavit that would result in no finding of probable cause. The defendant's first point of omission is that an individual who lived across the street from Gallo's gave a statement to the police stating that he had observed two light skinned black males walking toward Gallo's and then saw them later walking away from the store with a couple of bottles of liquor. The affidavit for the search warrant did not contain the witness' report that the two men were light skinned. The affidavit did state "two black males," and did not differentiate between light skinned or dark skinned black males. The defendant, who claims to be dark skinned, argues that if that affidavit did so state, the judge would have found that probable cause was lacking. We disagree. Even if the affidavit had stated that the witness observed two light skinned black males, the affidavit was sufficient for a finding of probable cause. Furthermore, the affida-

vit, while referring to similarly dressed black men robbing and shooting the Norwalk victim, referred to them as "medium to light skinned." There also was no showing that the affiants considered the defendant to be dark-skinned.

The defendant next claims that the affidavit should have included the statement from a witness who saw two males, one of whom she knew to be Ezra Stanton, at Gallo's shortly after 10:30 a.m. on the morning of the Gallo's shooting. During the hearing, the state informed the court that the witness later indicated to the police that she had made a mistake when she stated that Ezra Stanton was one of the individuals she saw at Gallo's. Consequently, the affiants' omission of her initial identification of Ezra Stanton was not material.

The defendant next claims that the warrant should have included the statement of the victim from a shooting in Norwalk that identified another individual, who was not involved in this case, one "Ruffin," as the one who had shot that victim. Ballistics evidence established that the same gun that was used in the homicide at Gallo's was used to shoot the victim in Norwalk. The defendant contends that the affidavit should have included the victim's statement that he was 99 percent sure that it was "Ruffin" who had shot him. In the warrant for the arrest of the defendant in connection with the Norwalk robbery, the state pointed out that the police officer who questioned that victim noted that the victim had stated that he thought all black males looked alike.[8] Consequently, the officer was not confident in the victim's identification of "Ruffin" as the perpetrator. Accordingly, we do not find that the affiants omitted a material fact by not including the fact that the victim in the Norwalk robbery made such an unreliable identification.

___

[8] The arrest warrant for the Norwalk robbery was admitted as an exhibit during the suppression hearing.

The defendant also claims that the affidavit failed to include the statement that Laurel had sold two handguns to "Chuck." LaFontaine's statement to police indicated that Eugene Laurel had a .22 caliber handgun, a .25 caliber handgun and a box of .25 caliber ammunition. In her statement, LaFontaine stated that Laurel had told her that he sold the guns to a "Chuck," who in turn kept the .22 caliber handgun and sold the .25 caliber handgun to somebody in Norwalk. We conclude that the affidavit, independent of LaFontaine's statement, traced the possession of the previously stolen, recovered and tested .25 caliber Titan handgun from Laurel to Gregory Profit and to the defendant. Even without the statement of LaFontaine, the warrant affidavit was sufficient for probable cause. Those allegations not challenged linked the defendant to the robbery and shooting at a Norwalk variety store while using the weapon, which had been stolen by Laurel from Serrano, after it had been stolen from its owner. The same weapon was linked by ballistics evidence to the Norwalk shooting and to the Gallo's homicide. Together with the description of the clothing worn by the perpetrators of the Norwalk robbery and shooting, and that worn by the defendant at the Gallo's shootings, along with the description of Harris' getaway vehicle used in the Gallo robbery and homicide, the facts were sufficient to find that the murder weapon could be found at the defendant's apartment where he and others were selling drugs.

The defendant next claims that the affidavit failed to state that Kimbel was the mother of Gregory Profit's children. It is the defendant's contention that because of the relationship that existed between Kimbel and Gregory Profit, Kimbel had a motive to lie to protect Gregory Profit. The affidavit, while not stating that Kimbel and Gregory Profit had children together, did state that she was his girlfriend. Accordingly, the warrant

revealed that a relationship existed between Kimbel and Gregory Profit. It was not material to the warrant to include the additional fact that the individuals had children together.

Accordingly, much of the omitted information was not material to the finding of probable cause. We conclude, moreover, that even had the challenged omissions been included in the affidavit, or misstatements omitted, the facts contained in the affidavit would support a finding of probable cause to issue the search warrant. We accordingly uphold the court's denial of the motion to suppress.

## VI

The defendant claims that certain of the court's evidentiary rulings deprived him of his constitutional right to present a defense. We disagree.

## A

At trial, the defendant sought to introduce into evidence the .22 caliber Beretta handgun that was seized from his apartment pursuant to a search warrant. The defendant stated he intended to recall Kimbel as a witness to show her that handgun to see if she could identify it as the weapon that Gregory Profit had purchased from Laurel, and not the .25 caliber Titan automatic later determined to be the murder weapon.

The court did not admit the Beretta, finding that the .22 caliber handgun was irrelevant. The following facts are relevant to the defendant's claim. The state presented evidence that on New Year's Day, 1999, Gregory Profit went with his girlfriend, Kimbel, to Danbury and purchased the .25 caliber Titan automatic pistol from Laurel. Laurel at the time also gave Profit a box of .25 caliber bullets. Profit then gave that gun and the bullets to the defendant in Norwalk. When police searched the defendant's apartment on January 25, 1999, they found

the box of .25 caliber bullets and the .22 caliber Beretta automatic pistol with a .22 caliber magazine.

The defendant testified that on New Year's Day, 1999, Gregory Profit gave him the box of .25 caliber bullets, which Profit had obtained from Laurel, the .22 caliber Beretta and a magazine. The magazine, which fit the Beretta, had a defective spring, and the .22 caliber Beretta was given to the defendant for repair. Before the jury, the defendant identified the Beretta and the magazine seized by the police as those given to him by Gregory Profit.

The defendant denied receiving the .25 caliber Titan automatic from Gregory Profit. The defendant also testified that while he was in prison, he telephoned his girlfriend, Gibson, to have her talk to Harris, whom he had seen with the gun and whom he thought still had the .25 caliber Titan automatic pistol. He wanted Gibson to tell Harris to get rid of that gun, which was the only way for the police to tie him and his cousin, Tommie Martin, to the Gallo homicide. The defendant testified that he wanted so badly to get rid of that gun because he knew "what went down that day" and "the situation behind [the gun]," and "did not want anyone to get in trouble."

The defendant also made an offer of proof. In that offer, the defendant stated that he intended to call Tasha Moffett, Terrell "Chuck" Stanton's girlfriend, and Richard Kopp, a Connecticut state police trooper. The defendant sought to elicit from the witnesses that on January 17, 1999, Kopp discovered a revolver in the glove compartment of Terrell Stanton's vehicle, which he did not seize. The defendant contended that the revolver found in the vehicle resembled the handgun used in homicide and robbery at Gallo's. After the defendant's offer of proof, the state informed the court that the gun observed by Kopp in the vehicle's glove compartment

was a revolver with a cylinder. The handgun used in the homicide and robbery at Gallo's, however, was a semiautomatic Titan handgun without such a cylinder. The court indicated it would not allow that evidence.

The defendant claimed that he wanted to show that the .22 caliber Beretta with a defective magazine was the weapon transferred by Laurel to Gregory Profit and later to the defendant on January 1, 1999. Laurel had testified, however, that he had transferred the .25 caliber Titan with a box of .25 caliber ammunition to Gregory Profit and gave a .22 caliber Derringer pistol to "Chuck" Stanton. Kimbel also had testified during the state's case and identified the .25 caliber Titan as the weapon that Gregory Profit had bought from Laurel. Although she was cross-examined extensively, no attempt was made at that time to show her the .22 caliber Beretta.

In attempting to place the murder weapon in the hands of one of the Stantons before the killing, the defendant also offered to call Moffett and Trooper Kopp to testify. He argued that because Ezra Stanton, the brother of Terrell "Chuck" Stanton, was identified as being at the murder scene, the evidence should have been admitted. As we stated previously, however, the witness who claimed that Ezra Stanton was at Gallo's stated that she was mistaken when she identified Ezra Stanton.

As the court noted, the evidence established that the .25 caliber Titan handgun killed the victim. The defendant denied having possession of the .25 caliber Titan handgun. He testified before the jury that he was in possession of the .22 caliber Beretta with a defective magazine that had been given to him by Gregory Profit on New Year's Day, 1999. Although the Beretta was not a full exhibit, the defendant identified it before the jury as the weapon he had received from Gregory Profit.

The defendant also testified that he called Gibson from prison and, while referring to the .25 caliber Titan as "dirty dishes," asked her to tell Harris to get rid of the gun because it was vital evidence against him as to the Gallo murder.

The identification of the .22 caliber Beretta before the jury renders harmless any improper ruling, should it be such, as to the admission of the .22 caliber Beretta as a full exhibit. The defendant's admission showing his knowledge that Harris had the murder weapon and the defendant's possession of the .25 caliber ammunition further renders harmless any improper ruling as to the admission of the .22 caliber Beretta.

Kimbel, whom the defendant wanted to recall to testify in his case, had been cross-examined by the defendant after identifying the .25 caliber Titan handgun that had been given to Gregory Profit by Laurel. We conclude that whether to allow a recall of a witness for further cross-examination is within the discretion of the trial court, which discretion the court properly exercised. See *State* v. *Booth*, 250 Conn. 611, 643, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

B

The defendant last claims that the court improperly excluded, on hearsay grounds, certain letters from Gibson and Antoni Profit that he offered into evidence. In his principal brief, the defendant states that the letters "would have enabled the jury to put the defendant's letters into context, making a fuller and more informed decision as to whether [he] was actually seeking to tamper with Nicole Harris. The letter from [Antoni] Profit, in particular, could have been used to flesh out the circumstances the state alleged constituted tampering, in order to establish that [he] had no intention or purpose in trying to get Nicole Harris to lie. . . . The

letters from Chantay Gibson would also have fleshed out the communication between Chantay, [himself] and Antoni Profit, which formed the basis for the tampering charges. At least one of the letters offered and refused discussed the relationship between Antoni Profit and Nicole Harris . . . . At least two of the letters the court would not allow the defendant to present also discuss this relationship, albeit peripherally."

The only citations that the defendant provides as to that issue are references to the doctrine of the admissibility, under certain circumstances, of letters written in reply to previous letters, as discussed in the 2001 edition of Professor Colin C. Tait's Handbook of Connecticut Evidence. That doctrine is not concerned with the question of hearsay in a document, but is rather a basis to find that the document is authenticated. The defendant, therefore, has failed to provide us with any legal analysis, and we decline to review the issue.

The judgments are affirmed.

In this opinion the other judges concurred.