796 F.2d 20
 55 USLW 2091
 UNITED STATES of America, Appellee,
v.
Eliot COHEN, a/k/a "Eli", Johnanne Winchester, a/k/a
"Johnnie Winchester," Harold Barr, a/k/a "Larry
Freeman", a/k/a "Barry Simon, a/k/a Jay
Foster", a/k/a "James
Aletter",
Defendants-
Appellants.
 Nos. 433, 668 and 651, Docket 85-1178, 85-1205 and 85-1229.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 13, 1986.
Decided June 30, 1986.
 
 Michael R. Bromwich, Asst. U.S. Atty., S.D.N.Y., New York City (Kenneth Roth, Asst. U.S. Atty., New York City, of counsel), for appellee.
 Richard P. Caro, New York City, for defendant-appellant Harold Barr.
 Lynne F. Stewart, New York City, for defendant-appellant Johnanne Winchester.
 Michael S. Washor, New York City (Harvey L. Greenberg, Washor, Greenberg & Washor, New York City, of counsel), for defendant-appellant Eliot Cohen.
 Before CARDAMONE and PRATT, Circuit Judges and WYZANSKI, District Judge.*
 CARDAMONE, Circuit Judge:
 
 
 1
 Appellants Arthur Barr, Johnanne Winchester and Eliot Cohen challenge the evidentiary and constitutional bases for their convictions in this multi-defendant drug conspiracy case. Except for one issue Barr raises, these challenges are without merit and do not warrant discussion. Therefore, the judgments of conviction of appellants Winchester and Cohen are affirmed.
 
 
 2
 Barr, the recognized "ring-leader" of the drug conspiracy, was arrested on June 1, 1984 and charged with conspiracy to distribute cocaine, in violation of 21 U.S.C. Sec. 846 (1982). When unable to post bail set at one million dollars, he was remanded into custody and held in pretrial detention at New York's Metropolitan Correctional Center (MCC). Subsequently, four superseding indictments were filed against appellant charging him with distribution of cocaine and interstate travel in aid of drug distribution activities in violation of 18 U.S.C. Sec. 1952 (1982), operating a continuing criminal enterprise, in violation of 21 U.S.C. Sec. 848 (1982), tax evasion, in violation of 26 U.S.C. Sec. 7201 (1982), obstruction of justice, in violation of 18 U.S.C. Sec. 1503 (1982) and witness tampering, in violation of 18 U.S.C. Sec. 1512 (1982).
 
 
 3
 Barr appeals from a judgment of conviction and of forfeiture entered against him on June 19, 1985 in the United States District Court for the Southern District of New York (Lasker, J.) following an eight-week jury trial. He was convicted of operating a continuing criminal narcotics enterprise, narcotics conspiracy (three counts), distribution of narcotics (38 counts), and tax evasion (three counts). The obstruction of justice and witness tampering charges were severed from the other charges during trial. Barr is serving concurrent sentences imposed on these convictions, the longest of which is 20 years. Of the eight issues Barr raises on appeal, seven are without merit. Only the search of his cell in the MCC, while awaiting trial, warrants discussion.
 
 FACTS
 
 4
 On July 5, 1984 MCC corrections officer, Lt. William Chevere, conducted a so-called "contraband" search of Barr's cell. The search lasted approximately half an hour and consisted entirely of an examination of Barr's papers. A short time later, Lt. Chevere returned and examined Barr's papers for an additional hour. Assistant United States Attorney Michael R. Bromwich later admitted in his affidavit that he initiated the July 5 "contraband" search by Lt. Chevere. He directed MCC prison authorities to enter Barr's cell "to look for certain types of documents that may have contained the names and phone numbers of other of Barr's co-conspirators and witnesses who Barr had already contacted and was still in the process of trying to contact."
 
 
 5
 In order to establish the requisite probable cause to obtain a search warrant for Barr's cell the next day, Det. Rocco R. Sanfillippo relied primarily on the information found by Lt. Chevere during the July 5 warrantless search of Barr's papers. Based on this information, a magistrate issued a search warrant on July 6 authorizing the seizure of all "written, non-legal materials belonging to Harold Barr." Pursuant to the warrant, Det. Sanfillippo and Lt. Chevere seized numerous sheets of paper from Barr's cell which included witness lists, notes on specific charges, personal matters, notes on conversations between Barr and his attorneys, and a sheet of paper on which the government contended Barr was practicing to disguise his handwriting.
 
 
 6
 Upon Barr's motion to suppress this evidence, the district court suppressed some of the material on Sixth Amendment grounds because they related to Barr's right to counsel. But the trial court refused to suppress the remaining papers or to declare the search unlawful on Fourth Amendment grounds.
 
 DISCUSSION
 
 7
 On appeal Barr challenges the July 5th search of his prison cell as a warrantless search conducted in violation of the Fourth Amendment. If he succeeds on this claim the evidence seized on July 6th will be suppressed since the information establishing probable cause for that search was the fruit of an unlawful search. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Barr further argues that the district court should have conducted a taint hearing to determine what fruits, if any, were obtained as a result of information derived from the warrantless search. The government relies on Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), for the proposition that the Fourth Amendment provides no protection for a prisoner's claim of a privacy right in his prison cell. It argues that the fruits of any search conducted of the cell of either a convicted prisoner or pre-trial detainee may not be suppressed on constitutional grounds.
 
 
 8
 A. Prior Case Law Leading to Hudson v. Palmer
 
 
 9
 To resolve this issue, it is helpful to review several Supreme Court decisions that preceded Hudson. Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948), set forth the general principle that lawful imprisonment necessarily entails a restriction or withdrawal of constitutional rights, "a retraction justified by the considerations underlying our penal system." Prison officials need wide latitude to subject prisoners to appropriate rules and regulations. Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam). Institutional security and related administrative problems as well as legitimate objectives of the correctional system require limitations on prisoner rights. Pell v. Procunier, 417 U.S. 817, 826, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974).
 
 
 10
 While those provisions of the Constitution that are applicable in general to all citizens must be accomodated to institutional needs and objectives, no wall separates the constitution from prison inmates. Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Thus, prisoners have been held to retain right of access to the courts, see Johnson v. Avery, 393 U.S. 483, 485, 89 S.Ct. 747, 748, 21 L.Ed. 2d 718 (1969); Ex parte Hull, 312 U.S. 546, 548-49, 61 S.Ct. 640, 641, 85 L.Ed. 1043 (1941); Equal Protection Clause of the Fourteenth Amendment protects them against invidious discrimination on the basis of race, except as may be essential to prison security, see Cruz v. Beto, 405 U.S. at 321, 92 S.Ct. at 1081; Lee v. Washington, 390 U.S. 333, 334, 88 S.Ct. 994, 995, 19 L.Ed.2d 1212 (1968) (per curiam); and the Eighth Amendment safeguards inmates from "deliberate indifference to [their] serious medical needs...." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).
 
 
 11
 From these cases there emerges a rule that when a prison restriction infringes upon a specific constitutional guarantee, it should be evaluated in light of institutional security. Security is the main objective of prison administration; prison officials must have broad latitude to adopt rules that protect the safety of inmates and corrections personnel and prevent escape or unlawful entry. Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). "This principle applies equally to pretrial detainees and convicted prisoners. A detainee simply does not possess the full range of freedoms of an unincarcerated individual." Id. at 546, 99 S.Ct. at 1878.
 
 
 12
 This brings us to the Supreme Court's 1984 decision in Hudson v. Palmer. In that case a convicted inmate filed an action against a prison official under 42 U.S.C. Sec. 1983 (1982) claiming that an unreasonable "shake down" search of his prison locker and cell violated his Fourth Amendment rights. The Court restated the now self-evident truth that prisoners retain rights as prisoners that are not "fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." 104 S.Ct. at 3198. Yet, because the interest of society in the security of its penal institutions outweighs the interest of the prisoner in privacy within his cell, it held that the traditional Fourth Amendment privacy right is "fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." Id. at 3200-01. Such a conclusion is bottomed on common sense because if drugs, weapons, and contraband are to be ferreted out of jail cells, then prison officials must have unrestricted access to those places to accomplish that objective. Concededly, isolated instances of unreasonable searches by prison officials may occur, but overall considerations of institutional security outweigh a prisoner's claim to privacy in particular cases. "We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security." Id. at 3201.
 
 
 13
 Prior to Hudson, decisions upholding cell searches had done so only in cases where prison officials had grounded the reason for the search on security. See Lyon v. Farrier, 727 F.2d 766, 769 (8th Cir.) (per curiam ), cert. denied, --- U.S. ----, 105 S.Ct. 140, 83 L.Ed.2d 79 (1984); Olson v. Klecker, 642 F.2d 1115, 1117 (8th Cir.1981); United States v. Lilly, 576 F.2d 1240 (5th Cir.1978), reh'g denied, 599 F.2d 619 (5th Cir.1979) (per curiam); United States v. Ready, 574 F.2d 1009, 1014 (10th Cir.1978) ("Certainly in a federal prison the authorities must be able to search the prisoners' cells without a warrant, without notice and at any time, for concealed weapons and contraband of the type which threatens the security or legitimate purposes of the institution."); Bonner v. Coughlin, 517 F.2d 1311, 1316-17 (7th Cir.1975). In determining whether pre-trial detainees had superior rights to convicted prisoners, the Supreme Court stated in Bell v. Wolfish, 441 U.S. at 546, 99 S.Ct. at 1877, that the fact of confinement and the legitimate objectives of the penal institution curtail the constitutional rights of any prisoner, whether convicted or not. Although pretrial detainees have not been adjudicated guilty of the crimes for which they have been charged, the Court believed that in terms of prison security there was no basis to conclude that pre-trial detainees pose a lesser risk to security than convicted inmates. Id. at 546 n. 28, 99 S.Ct. at 1878 n. 28.
 
 
 14
 We are left then with deciding whether the consistent holdings of the Supreme Court in the several decisions recited mean that a pre-trial detainee retains no Fourth Amendment rights, regardless of the circumstances underlying the search. This is the view the government urges. We refuse to adopt it in this case for the following reasons.
 
 B. Application of Law to Present Facts
 
 15
 In this case, the record clearly reveals that the July 5th search of Barr's cell was initiated by the prosecution, not prison officials. The decision to search for contraband was not made by those officials in the best position to evaluate the security needs of the institution, nor was the search even colorably motivated by institutional security concerns. The Supreme Court in Hudson did not contemplate a cell search intended solely to bolster the prosecution's case against a pre-trial detainee awaiting his day in court; it did not have before it the issue of whether such a search could lawfully be used by government prosecutors to uncover information that would aid them in laying additional indictments against a detainee. We read Hudson to hold that prison officials are presumed to do their best to evaluate and monitor objectively the security needs of the institution and the inmates in their custody, and then to determine whether and when such concerns necessitate a search of a prison cell.
 
 
 16
 The door on prisoner's rights against unreasonable searches has not been slammed shut and locked. We take seriously the Court's statement that no iron curtain separates prisoners from the Constitution, and that the loss of such rights is occasioned only by the legitimate needs of institutional security. The emphasis on the need to accommodate individual rights to what is recognized as legitimate penological objectives is the dominant theme throughout the Supreme Court's writing on this subject. From this it is patent that since no wall of steel and stone separates prisoners from the Constitution, prisoners' rights continue to exist. It is the scope of these rights that is necessarily limited by the broad authority prison officials must have to ensure institutional security; obviously the creation of a limitation or condition on the exercise of constitutional rights is essential to orderly prison administration. Yet, because conditioning the exercise of such rights rests on the twin-rationale of objective administrators insuring prison security, a limitation imposed on prisoners' constitutional rights cannot stand when the objectives the rationale serves are absent. Nor may federal courts charged with the duty to protect the rights of all citizens fulfill that obligation merely by paying lip-service to this concept.
 
 
 17
 In this case it is plain that no institutional need is being served. Were it a prison official that initiated the search of Barr's cell, established decisional law holds that the search would not be subject to constitutional challenge, regardless of whether security needs could justify it. But here the search was initiated by the prosecution solely to obtain information for a superseding indictment. In our view, this kind of warrantless search of a prisoner's cell falls well outside the rationale of the decided cases. Barr retains a Fourth Amendment right--though much diminished in scope--tangible enough to mount the attack on this warrantless search.
 
 
 18
 We hold therefore that Barr retains an expectation of privacy within his cell sufficient to challenge the investigatory search ordered by the prosecutor. Because his effects were searched at the instigation of non-prison officials for non-institutional security related reasons, the validity of the search may be challenged. An individual's mere presence in a prison cell does not totally strip away every garment cloaking his Fourth Amendment rights, even though the covering that remains is but a small remnant.
 
 
 19
 Thus, the district court's refusal to suppress all of the evidence obtained in Barr's cell search is reversed. Nevertheless, we remand the case to that court for it to decide whether--in light of the overwhelming evidence of Barr's guilt--the failure to suppress this material was harmless error. The trial court should hold a taint hearing to consider what fruits, if any, were obtained from information seized in the warrantless search of July 5th. We are cognizant of the fact that the evidence seized related primarily to the witness tampering and obstruction of justice charges, neither of which convictions are before us on appeal. The remand will permit the district court to decide what prejudice, if any, Barr suffered from the admission of this evidence.
 
 
 20
 Affirmed in part, reversed and remanded in part.
 
 
 
 *
 Honorable Charles E. Wyzanski, Jr., United States District Judge for the District of Massachusetts, sitting by designation