**COMMONWEALTH of Pennsylvania,
Appellant**

v.

**Emmanuel MOORE, Appellee.**

Superior Court of Pennsylvania.

Argued March 27, 2007.
Filed July 12, 2007.

Peter Carr, Asst. Dist. Atty., Philadelphia, for Com., appellant.

Dennis J. Cogan, Philadelphia, for appellee.

BEFORE: FORD ELLIOTT, P.J., GANTMAN, J., and McEWEN, P.J.E.

OPINION BY GANTMAN, J.:

¶ 1 Appellant, the Commonwealth of Pennsylvania, appeals from the order entered in the Philadelphia County Court of Common Pleas, which granted a motion to suppress the Commonwealth's evidence on behalf of Appellee, Emmanuel Moore.[1] The Commonwealth asks us to determine whether, as a prisoner, Appellee can claim a constitutional right to privacy in his non-privileged prison mail. We hold Appellee has no constitutional right to privacy in his non-privileged prison mail. Accordingly, we reverse the trial court's suppression order and remand for further proceedings.

¶ 2 The trial court opinion sets forth the relevant facts of this case as follows:

> On December 3, 2004, Lt. Raymond Knauer of the Internal Security Department (hereinafter, "Security Office") of the Department of Corrections at Graterford was contacted telephonically by Philadelphia Homicide Detective John Keen regarding an inmate at SCI–Graterford, [Appellee Emmanuel Moore].[2] Detective Keen ... asked that Lt. Knauer copy all incoming and outgoing mail of [Appellee] because they were looking for [Moore's] brother, [Ronald Bethea ("Bethea")], to arrest him for the September 16, 2004 murder of one Dante Jones and injury of Anthony Hall. Detective Keen wanted to get copies of

1. Pursuant to Pennsylvania Rule of Appellate Procedure 311(d), in a criminal case, "the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution." Pa.R.A.P. 311(d). Instantly, the Commonwealth properly certified that the suppression order substantially handicapped the prosecution of its case by precluding the admission of relevant and material evidence.

2. Appellee was incarcerated pursuant to a parole violation in an unrelated case.

[Appellee's correspondence to locate Bethea]. Lt. Knauer directed Detective Keen to submit his request in writing, setting forth the facts that had been conveyed to [Lt. Knauer] regarding the need for the mail intercepts, and the Detective did so. [Lt. Knauer] advised Detective Keen that he would have to first secure authorization from Regional Deputy Secretary Donald T. Vaughn because any request that mail be read and reproduced required his approval.

On December 3, 2004, Lt. Knauer submitted to Regional Deputy Secretary Vaughn a "Request for Mail Scrutiny" requesting "[s]crutiny of non-privileged incoming and outgoing mail for [Appellee, pursuant to] DC–ADM 803, Section VI.D 1, paragraph c." In support of that request, [Lt. Knauer] indicated that "[t]here is reason to believe that: Security may be impaired in that this inmate may be using this directive to conduct Criminal Activity."

\* \* \*

Regional Deputy Secretary Vaughn authorized the "scrutiny" of [Appellee's] mail on December 3, 2004, . . . and every 30 days thereafter based on [Lt. Knauer's] continuing requests, which did not at any time contain new or additional information other than what had been initially submitted by Lt. Knauer's initial request to scrutinize [Appellee's] mail on December 3, 2004.

After the approval from the Regional Deputy Secretary was received, the mailroom was notified. The mailroom pulled the mail for the Security Office; this mail did **not** include privileged mail. After making copies of the non-privileged mail, the mail continued on its course. On [Lt. Knauer's] copies of the mail, [he] noted whether it was incoming or outgoing, and the date he scrutinized

it. He received copies of the contents as well as of the envelopes the mail came (or went) in. He made notations as to the addressee/return address of the scrutinized mail. Lt. Knauer usually faxed or mailed the copied material to [homicide detectives].

[Bethea] was taken into custody on December 8, 2004. Investigative leads from two items of mail received by the Detectives from [Lt. Knauer] did assist in locating [Bethea] in Wilmington, Delaware.

(Trial Court Opinion, filed August 7, 2006, at 2–4) (emphasis in original) (internal citations omitted). Appellee and his acquaintances employed codes to conceal their messages. They also used blank lines to conceal names; for instance, they used "T ——" or "——" to conceal the name "Tone," a common nickname for Anthony.

¶ 3 On May 5, 2006, the Commonwealth filed a motion *in limine* seeking admission of the letters obtained pursuant to Lt. Knauer's efforts. The Commonwealth argued the letters demonstrated Appellee and Bethea's objective to prevent Anthony Hall from presenting inculpatory evidence at trial. Anthony Hall was released from custody sometime in January 2005. On March 9, 2005, Hall asserted his Fifth Amendment privilege when called to testify at a preliminary hearing. On May 17, 2005, he recanted his statements identifying Appellee and Bethea; following his recantation, Hall eluded service of process. The Commonwealth concluded the letters obtained by Lt. Knauer demonstrate an objective to compel Hall's silence by threat of force.

¶ 4 On May 9, 2006, Appellee filed a motion for an evidentiary hearing to determine the extent to which scrutiny of his letters violated the attorney-client and work product privileges. On May 11, 2006, Appellee filed a motion to suppress

his mail and its evidentiary fruits. Generally, Appellee conceded prisoners have no constitutional protection from searches in furtherance of legitimate prison security concerns. However, Appellee argued prisoners enjoy constitutional protections from searches initiated to pursue criminal investigations unrelated to security concerns. When prison officials seized and copied his mail at the request of detectives investigating a murder, they violated his constitutional rights. Appellee concluded the letters and their evidentiary fruits should be suppressed because they were obtained without a warrant, in violation of his constitutional rights.

¶ 5 The hearing on the parties' pre-trial motions continued for three (3) days, May 15–18, 2006. Appellee and Bethea did not present evidence at the hearing to support the motion to suppress. On the first day of the suppression hearings, Lt. Knauer testified that all inmates receive a prison handbook which states "[a]ll mail coming into the State Correctional Institution is opened and inspected for contraband." (N.T. Suppression Hearing, 5/15/06, at 45). The handbook directed prisoners to administrative policy directive DC–ADM 803, which further explains the prison's mail handling policy. (*Id.* at 89). Lt. Knauer made copies of the original letters, which were sent "to their destination; whether it's incoming, they would go to [Appellee]; if they were outgoing, ... the letters would be sealed and sent on their destination." (*Id.* at 54).

¶ 6 On May 18, 2006, the suppression court issued a memorandum, which included the following conclusion of law:

Because [Appellee's] non-legal incoming and outgoing mail was seized, scrutinized and copied at the instigation of **non-prison** officials for non-institutional reasons, these *actions* violated [Appellee's] rights pursuant to not only Article

1, [Section] 8 of the Pennsylvania Constitution, but even of the Fourth Amendment of the United States Constitution. A search warrant would have been necessary for Detectives ... to obtain the evidence they sought, had they even been able to gather the requisite probable cause. Accordingly, all of [Appellee's] mail ... is hereby ordered suppressed.

(Trial Court Memorandum, filed May 18, 2006, at 3) (emphasis in original). That same day, the Commonwealth filed a timely notice of appeal and voluntarily filed a concise statement of matters complained of on appeal, pursuant to Pennsylvania Rule of Appellate Procedure 1925(b).

¶ 7 The Commonwealth presents the following issues for review:

DO PRISON INMATES HAVE A SOCIETALLY SANCTIONED PRIVACY INTEREST IN THEIR NON–LEGAL MAIL?

IF SO, DID [APPELLEE] DEMONSTRATE A SUBJECTIVE EXPECTATION OF PRIVACY IN HIS PRISON CORRESPONDENCE, WHICH CONTAINED CODED REFERENCES TO DRUG ACTIVITY AND EFFORTS TO CONTACT THE EYEWITNESS TO THE INSTANT MURDER?

(Commonwealth's Brief at 2).

¶ 8 In its first issue on appeal, the Commonwealth argues the text of Article 1, Section 8 of the Pennsylvania Constitution is substantially identical to the text of the Fourth Amendment of the United States Constitution. (*Id.* at 25). Pennsylvania courts have not interpreted Article 1, Section 8 of the Pennsylvania Constitution to confer farther-reaching rights than the Fourth Amendment. To date, the United States and Pennsylvania Constitutions have been held to provide co-extensive protections to inmates in their non-privileged incoming and outgoing mail.

¶ 9 The Commonwealth further contends prison officials inspect non-privileged mail for physical contraband. Information contained in the text of prisoner mail constitutes a type of contraband, specifically, communication in furtherance of criminal objectives occurring inside and outside prison walls. Thus, in consideration of penal security, society does not recognize an inmate's privacy interest in his non-privileged mail. The identity of the party investigating an inmate's mail, the motive for the investigation, the status of the inmate (pre-trial detainee or convict), and the absence of a search warrant are immaterial, because prisoners enjoy no objective, societally-sanctioned privacy interest in their non-privileged mail.

¶ 10 In the alternative, the Commonwealth avers Appellee and his acquaintances used coded references and avoided specific names, demonstrating an effort to conceal their dialogue. Such effort indicated they had no subjective expectation that their correspondence would remain private. Thus, Appellee's coded references belie his assertion of a subjective expectation of privacy. The Commonwealth concludes the court's suppression order should be reversed. We agree.

 ¶ 11 The following principles guide our analysis of the Commonwealth's issues:

When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the

suppression court properly applied the law to the facts.

*Commonwealth v. Clinton*, 905 A.2d 1026, 1029–30 (Pa.Super.2006) (quoting *Commonwealth v. Boulware*, 876 A.2d 440, 442 (Pa.Super.2005)).

## ANALYSIS UNDER THE FEDERAL CONSTITUTION

 ¶ 12 The Fourth Amendment of the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. Nevertheless, "[o]fficial conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 408, 125 S.Ct. 834, 837, 160 L.Ed.2d 842, 847 (2005) (internal citations omitted).

 ¶ 13 Justice Harlan's concurring statement in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), articulated a two-fold requirement for individuals asserting Fourth Amendment search and seizure protections:

[T]here is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and second, that the expectation be one that society is prepared to recognize as "reasonable." Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not protected because no intention to keep them to himself has been exhibited.

*Id.* at 361, 88 S.Ct. at 516, 19 L.Ed.2d at 588. To satisfy the first requirement, the individual must demonstrate that he sought to preserve something as private. *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226 (1979). To satisfy the second, the individual's expectation of privacy must be justifiable under the circumstances. *Id.* In *Smith,* the United States Supreme Court explained: "This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 743–44, 99 S.Ct. at 2582, 61 L.Ed.2d at 229.

¶ 14 In *United States v. Solomon,* 2007 WL 1099097 (W.D.Pa.2007), the United States District Court was asked to determine "whether Defendant Solomon had a reasonable expectation of privacy in his incoming and outgoing [non-privileged] mail while he was an inmate at various penal institutions." *Id.* at *1. While *Solomon* sets no binding precedent for this Court, it presents a well-researched digest of Fourth Amendment jurisprudence as applied to non-privileged prisoner mail:

> Given the realities of institutional confinement, any reasonable expectation of privacy a detainee retains necessarily is of diminished scope. *Bell v. Wolfish,* 441 U.S. 520, 557, [99 S.Ct. 1861, 1883, 60 L.Ed.2d 447] (1979).[3] Although inmates do not forfeit all constitutional protections by reason of their confinement in prison, *Wolff v. McDonnell,* 418 U.S. 539, 555–56, [94 S.Ct. 2963, 2974, 41 L.Ed.2d 935] (1974), the threshold determination is whether a prisoner's expectation is "legitimate" or "reasonable."

---

3 That the Fourth Amendment rights of prisoners are limited has been consistently recognized. *See, e.g., Hudson v. Palmer,* 468 U.S. 517, [104 S.Ct. 3194, 82 L.Ed.2d 393] (1984) ( [holding] inmate had no reasonable expectation of privacy in his prison cell entitling him to protection of Fourth Amendment).

■■ In *Stroud v. United States,* 251 U.S. 15, 21–22, [40 S.Ct. 50, 52–53, 64 L.Ed. 103 (1919)], the United States Supreme Court held that there was no violation of the Fourth Amendment when letters containing incriminating material written by a prisoner were intercepted by prison personnel and later introduced against him at trial. The Supreme Court noted that the letters came into the possession of prison officials under established practice, reasonably designed to promote institutional discipline. *Id.* at 21, [40 S.Ct. at 52]. Several circuit courts subsequent to *Stroud* have held that jail officials do not violate an inmate's Fourth Amendment rights by inspecting the inmate's mail. *See, e.g., Stow v. Grimaldi,* 993 F.2d 1002, 1004–05 (1st Cir.1993) (holding that a New Hampshire State Prison practice of requiring non-privileged outgoing mail to be submitted for inspection in unsealed envelopes does not violate prisoners' constitutional rights); *Smith v. Delo,* 995 F.2d 827, 830 (8th Cir.1993), [cert. denied, 510 U.S. 1052, 114 S.Ct. 710, 126 L.Ed.2d 676, (1994) ] ( [holding] prison officials are justified in screening outgoing non-legal mail for escape plans, contraband, threats, or evidence of illegal activity); *United States v. Whalen,* 940 F.2d 1027, 1034–35 (7th Cir.[1991] ), *cert. denied,* 502 U.S. 951, [112 S.Ct. 403, 116 L.Ed.2d 352] (1991) (holding that because prison officials are permitted to examine inmate mail to ensure that the mail does not interfere with the orderly running of the prison, contain threats, or facilitate criminal activity, there is no expectation of privacy in mail that inmates are required to leave unsealed); *United States v. Kelton,* 791 F.2d 101, 103 (8th Cir.1986), [cert. denied, 479 U.S. 989, 107 S.Ct. 583, 93 L.Ed.2d 586

(1986)] ([holding] prisoner's Fourth Amendment rights were not violated when prison official inspected and copied prisoner's outgoing mail); *Smith v. Shimp*, 562 F.2d 423, 426–27 (7th Cir. 1977) (reasoning that when a pretrial detainee sends non-privileged mail, he knowingly exposes same to possible inspection by jail officials and consequently yields to reasonable search and seizure); *United States v. Baumgarten*, 517 F.2d 1020, 1028 (8th Cir.1975), *cert. denied*, 423 U.S. 878, [96 S.Ct. 152, 46 L.Ed.2d 111] (1975) (holding that, under circumstances where prisoner knew of official policy of reading prisoners' outgoing and unsealed mail, prisoner cannot say the state gained access to contents of a letter by unlawful search and seizure).

*Id.* at *2–3. The federal court ultimately held that Solomon had no reasonable expectation of privacy in his non-privileged mail.[3]

■ ¶ 15 Instantly, prison officials informed Appellee about the prison's mail inspection procedure when he first arrived at prison. The inmate handbook and the Department of Corrections policy directives detail the prison's policy of mail inspection. Lt. Knauer testified at the May 15, 2006 suppression hearing that all mail sent to prisoners funnels through the prison mail room. Pursuant to procedure, the mail room correction officers opened Appellee's non-privileged incoming mail to ascertain whether it contained contraband. Appellee also submitted his outgoing non-privileged correspondence to the mail room in unsealed envelopes, per prison policy. Appellee availed himself of a process that exposed his correspondence to the plain view of prison officials; therefore, society would not recognize any alleged subjective expectation of privacy as reasonable. *See Smith, supra; Katz, supra.*

¶ 16 Furthermore, Appellee and Bethea corresponded in coded language to keep their dialogue concealed from police. The use of codes demonstrates their desire to convey information in a furtive manner given the likelihood of inspection. The use of codes also suggests their true expectation that the mail would be read. Therefore, Appellee cannot claim the Fourth Amendment conferred upon him any legitimate expectation of privacy under these circumstances. *See id.*

## ANALYSIS UNDER THE PENNSYLVANIA CONSTITUTION

■ ¶ 17 Under certain circumstances, "our state constitution provides greater protection than the Fourth Amendment." *Commonwealth v. Hoak*, 700 A.2d 1263, 1266 (Pa.Super.1997) *(en banc), affirmed*, 557 Pa. 496, 734 A.2d 1275

---

**3.** Appellee cites *United States v. Cohen*, 796 F.2d 20 (2nd Cir.1986), *cert. denied*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986) for the proposition that inculpatory evidence obtained from warrantless searches of holding cells for non-institutional objectives should be suppressed. Initially we note the simplest response to Appellee's point is that we are not required "to employ federal law from a foreign jurisdiction in order to interpret Pennsylvania law." *Commonwealth v. Giffin*, 407 Pa.Super. 15, 595 A.2d 101, 107 (1991). Federal court decisions such as *Cohen* are not generally binding on Pennsylvania courts, even where they concern federal questions. *Id.* Further, later authority limits *Cohen* to situations involving pre-trial detainees. *See, e.g., Willis v. Artuz*, 301 F.3d 65 (2nd Cir. 2002) (holding convicted prisoners have no privacy rights in prison cells; *Cohen* applies to searches of pre-trial detainees' holding cells instigated by non-prison officials for reasons unrelated to security). Nevertheless, given our holding that convicted prisoners have no privacy rights in their mail, *Cohen* as no application in the instant case.

(1999). Therefore, we must determine whether Article 1, Section 8 of the Pennsylvania Constitution compels a different result than our analysis under the federal constitution. When reviewing whether the Pennsylvania Constitution confers more rights than its federal counterpart, we examine: (1) the text of the Pennsylvania constitutional provision; (2) the history of the provision, including Pennsylvania case law; (3) related case law from other states; and (4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence. *Commonwealth v. Crouse*, 729 A.2d 588, 594 (Pa.Super.1999), *appeal denied*, 560 Pa. 738, 747 A.2d 364 (1999) (citing *Commonwealth v. Edmunds*, 526 Pa. 374, 390, 586 A.2d 887, 895 (1991)).

¶ 18 Article 1, Section 8 of the Pennsylvania Constitution provides:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8.

> Article I, Section 8 of the Pennsylvania Constitution requires that searches and seizures by the Commonwealth be permitted only upon obtaining a warrant based upon probable cause issued by a neutral and detached magistrate. Thus, broadly speaking, searches and seizures conducted without a prior determination of probable cause are unreasonable for constitutional purposes.

*Commonwealth v. Rekasie*, 566 Pa. 85, 91, 778 A.2d 624, 628 (2001).

¶ 19 We observe:

Although the language utilized in Article I, Section 8 of the Pennsylvania Constitution is similar to that in the Fourth Amendment to the United States Constitution, the decisions of the United States Supreme Court are not dispositive of questions regarding the rights guaranteed to citizens of this Commonwealth pursuant to the Pennsylvania Constitution. We are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical.

*Commonwealth v. Hughes*, 575 Pa. 447, 462, 836 A.2d 893, 901 (2003). "[I]t is not the text itself which imbues Pennsylvania jurisprudence with its unique character, but, rather, the history of our case law as it has developed in the area of search and seizure." *Crouse, supra* at 595 (internal citations omitted).

¶ 20 In *Crouse, supra*, this Court discussed the contrasts between the right to privacy conferred under Article 1, Section 8 and the rights granted pursuant to the Fourth Amendment:

> The notion of privacy implicit in Article I, Section 8 of the Pennsylvania Constitution is particularly strong in this Commonwealth. Pennsylvania Courts have recognized that our constitution can provide greater rights and protections to the citizens of this Commonwealth than those provided under similar provisions of the federal constitution. Indeed, the analysis of the history of Article I, Section 8, as set forth in *Edmunds, supra* and *[Commonwealth v. Cass*, 551 Pa. 25, 709 A.2d 350 (1998), *cert. denied*, 525 U.S. 833, 119 S.Ct. 89, 142 L.Ed.2d 70 (1998) ]*, demonstrates the particular importance of the right to privacy in Pennsylvania jurisprudence. Nevertheless, the right to privacy under Pennsylvania law, although extensive, is not unlimited.

\* \* \*

Our Supreme Court has also offered clear guidance in the context of a "greater protections" state constitutional analysis: we are to construe the Pennsylvania constitution as providing greater rights to its citizens than the federal constitution **only where there is a compelling reason** to do so. Although the United States Supreme Court's opinions are not necessarily binding on a state's decisions to provide its citizens with greater rights, a state court is expected "to deal carefully with a Supreme Court opinion and to explain forthrightly why it found itself constrained to reason differently."

*Id.* at 595–96 (emphasis added) (internal citations omitted).

¶ 21 Further, we note:

In determining the scope of protection afforded under Article I, Section 8, [the Pennsylvania Supreme Court] employs the same two-part test employed by the United States Supreme Court to determine the sweep of the Fourth Amendment of the U.S. Constitution—a test first articulated by Justice Harlan in his concurring opinion in *[Katz]*. That test requires a person to (1) have established a subjective expectation of privacy and (2) have demonstrated that the expectation is one that society is prepared to recognize as reasonable and legitimate.

*Commonwealth v. Duncan,* 572 Pa. 438, 452, 817 A.2d 455, 463 (2003) (internal citations omitted).

¶ 22 We note:

An expectation of privacy will be found to exist when the individual exhibits an actual or subjective expectation of privacy and that expectation is one that society is prepared to recognize as reasonable. In determining whether a person's expectation of privacy is legitimate or reasonable, the totality of the circumstances must be considered and the determination will ultimately rest upon a balancing of the societal interests involved. The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances.

*Commonwealth v. Viall,* 890 A.2d 419, 422 (Pa.Super.2005).

¶ 23 Several state courts have interpreted the Fourth Amendment to provide no expectation of privacy to prisoners in their mail. *See Bowen v. State,* 342 Ark. 581, 30 S.W.3d 86 (2000) (holding prisoner has no reasonable expectation of privacy in his mail, even when prison offered no notice it would inspect prisoner's mail); *State v. Hawkins,* 70 Wash.2d 697, 425 P.2d 390, 395 (1967), *cert. denied,* 390 U.S. 912, 88 S.Ct. 840, 19 L.Ed.2d 883 (1968) (stating: "[F]or very obvious security reasons, practically every jail and penal institution examines the letters and packages, incoming and outgoing, of all inmates. Certainly, there can be no claim of invasion of privacy under such circumstances."); *People v. Harris,* 83 Cal.App.4th 371, 99 Cal.Rptr.2d 618 (2000) (holding prisoner has no expectation of privacy in his mail); *People v. Garvey,* 99 Cal.App.3d 320, 160 Cal.Rptr. 73 (1979) (stating same).

¶ 24 Other states suggest notice that prisoner mail will be inspected eviscerates any expectation of privacy a prisoner might have in his mail. *See State v. Wiley,* 355 N.C. 592, 565 S.E.2d 22 (2002), *cert. denied,* 537 U.S. 1117, 123 S.Ct. 882, 154 L.Ed.2d 795 (2003) (holding: (1) following notice of mail scrutiny, defendant had unreasonable expectation of privacy in mail; (2) prison officials permitted to seize and copy mail without warrant); *State v. Martin,* 77 Conn.App. 778, 825 A.2d 835 (2003),

*certification denied,* 266 Conn. 906, 832 A.2d 73 (2003) (holding department of corrections notified defendant his mail would be read, thus, he had no reasonable expectation of privacy in his letters); *Merritt v. State,* 982 S.W.2d 634 (Tex.App.1998) (holding: (1) inmate handbook warned appellant his mail would be censored; thus, defendant had no reasonable expectation of privacy; and (2) numerous courts have permitted the censorship of prison mail). Under various legal analyses, these state courts have declined to extend broader rights than those granted by the Fourth Amendment to prisoners in their mail.

¶ 25 The policy considerations animating the Commonwealth's issue are basic and quickly discerned: "Although prison walls do not separate inmates from their constitutional rights, because of the unique nature and requirements of the prison setting, imprisonment 'carries with it the circumscription or loss of many significant rights ... to accommodate a myriad of institutional needs ... chief among which is internal security.'" *Payne v. Commonwealth Dept. of Corrections,* 582 Pa. 375, 399, 871 A.2d 795, 809 (2005) (quoting *Small v. Horn,* 554 Pa. 600, 722 A.2d 664, 669–70 (1998)). Prisoners have used the mail to transport contraband into and out of prison, to discuss and participate in ongoing criminal activity, and to coordinate escape plans. *See Solomon, supra.* An unrestricted privacy interest in non-privileged mail would assist criminal objectives by facilitating the transmission of information. *See id.* On the other hand, prisoners must appreciate the inherent loss of privacy in a prison, where security and surveillance obviate any legitimate expectation of privacy. *Id.*

 ¶ 26 Instantly, our Supreme Court employs the two-part *Katz* test to determine the nature and scope of rights under Article 1, Section 8 of the Pennsyl-

vania Constitution. *Duncan, supra.* Under that analysis, society would consider Appellee's expectation of privacy unreasonable, particularly where Appellee placed his non-privileged mail into the hands of prison officials. Additionally, Appellee's use of coded language belies any subjective expectation that his non-privileged mail would remain private. Given the co-extensive analyses required by the Pennsylvania and United States constitutions, we conclude there is no compelling reason to construe Article 1, Section 8 as providing greater rights than the Fourth Amendment of the United States Constitution. *See Crouse, supra.*

¶ 27 Based upon the foregoing, we hold Appellee has no constitutional right to privacy in his non-privileged prison mail. Accordingly, we reverse the trial court's suppression order and remand for further proceedings.

¶ 28 Order reversed; case remanded for further proceedings. Jurisdiction is relinquished.