**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Terrance Jamar THOMPSON,**
**Appellant.**

Superior Court of Pennsylvania.

Submitted Aug. 6, 2007.
Filed Oct. 10, 2007.

Daniel DeLisio, Pittsburgh, for appellant.

Michael W. Streily, Deputy Dist. Atty., Pittsburgh, for Com., appellee.

BEFORE: STEVENS, LALLY–GREEN, and BENDER, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered by the Court of Common Pleas of Allegheny County on May 2, 2006, following Appellant's conviction by a jury of two (2) counts of aggravated assault.[1] Herein, Appellant contends that there was insufficient evidence adduced at trial to sustain his convictions; and, the trial court erred in permitting the Commonwealth to introduce into evidence the text of a letter. We affirm the judgment of sentence.

¶ 2 At approximately 4:00 p.m., on May 3, 2004, sixteen-year-old L.H. ("Victim"), while walking on Franklin Avenue in Wilkinsburg en route to a friend's house, observed three unknown black males standing in an alleyway. As Victim proceeded past the men, all of whom were dressed in

1. 18 Pa.C.S.A. § 2702(a)(1) (causing serious bodily injury) and (a)(4) (use of a deadly weapon).

black, he heard a number of gunshots. Although he attempted to dodge the bullets, he was shot in the side. He made his way to South Avenue, asked someone for help, and then collapsed to the ground. Police and paramedics were summoned to the scene. Victim received treatment and then was transported to the University of Pittsburgh Medical Center, where he underwent surgery for removal of the bullet.

¶ 3 Following a police investigation, Appellant was charged with criminal attempt (homicide) and two (2) counts of aggravated assault in connection with the shooting of Victim. A jury trial was held, at the conclusion of which Appellant was convicted of two (2) counts of aggravated assault. On May 2, 2006, he was sentenced to a one hundred (100) to two hundred (200) month term of imprisonment on the first count of aggravated assault (causing serious bodily injury).[2] The present appeal followed.[3]

¶ 4 Herein, Appellant raises the following questions for review:

I. WHETHER THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN PERMITTING THE COMMONWEALTH TO INTRODUCE INTO EVIDENCE OVER [Appellant's] CONTEMPORANEOUS OBJECTION, THE CONTENTS OF A LETTER THAT HE SENT FROM THE ALLEGHENY COUNTY JAIL AND WAS RETURNED TO THE JAIL AS UNDELIVERABLE, SINCE THE SEIZURE OF THE LETTER AND READING OF ITS CONTENTS WAS IN VIOLATION OF [Appellant's] ABSOLUTE RIGHT TO BE FREE OF UNLAWFUL GOVERNMENTAL SEARCHES AND SEIZURES WHICH IS SECURED BY THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION EIGHT OF THE PENNSYLVANIA CONSTITUTION?

II. WHETHER THE SUM TOTAL OF ALL THE EVIDENCE ADDUCED AT TRIAL, EVEN WHEN LOOKED AT IN A LIGHT MOST FAVORABLE TO THE COMMONWEALTH AS THE VERDICT WINNER, WAS SUFFICIENT AS A MATTER OF LAW TO CONVICT [Appellant] OF TWO COUNTS OF AGGRAVATED ASSAULT IN THE SHOOTING OF [Victim]?

Brief of Appellant at 3.

■ ¶ 5 We first will address Appellant's challenge to the sufficiency of the evidence. In doing so, we must determine:

whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict[-]winner, are sufficient to establish all elements of the offense beyond a reasonable doubt. We may not weigh the evidence or substitute our judgment for that of the fact-finder. Additionally, the evidence at trial need not preclude every possibility of innocence, and the fact-finder is free to resolve any doubts regarding a defendant's guilt unless the evidence is so weak and inconclusive that as a matter of law no facts supporting a finding of guilt may be drawn. The fact-finder, when evaluating the credibility and weight of the evidence, is free to believe all, part, or none of the evidence.

---

**2.** No further penalty was imposed on the second count of aggravated assault.

**3.** Appellant filed a concise statement of matters complained of on appeal, to which the court issued an opinion in accordance with Pa.R.A.P. 1925(a).

*Commonwealth v. Stevenson,* 894 A.2d 759, 773 (Pa.Super.2006) (citations and quotations omitted).

¶ 6 Aggravated assault is defined in 18 Pa.C.S.A. § 2702 and provides, in pertinent part, as follows:

(a) **Offense defined.**—A person is guilty of aggravated assault if he:

(1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life;

. . . .

(4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon[.]

18 Pa.C.S.A. § 2702(a)(1) and (4).

¶ 7 With the above principles in mind, the evidence adduced at trial, as aptly summarized by the trial court, is as follows:

Lynette Jackson testified that she was at her mother's house on South Avenue in Wilkinsburg on the afternoon of May 3, 2004. She heard gunshots and then someone banged on her front door. She did not answer the door; however, three black males, dressed in black leather, entered the residence through the rear door. She recognized two of the men as "Patch Head" and "T–Rock" (the [Appellant] ). She did not know the third man. The men were very nervous. (N.T. 02/28/06, pp. 42–53)

Kimberly Ewing, who is Lynette Jackson's mother, stated that when she arrived home from the grocery store, there were three men in her home. She identified the [Appellant] as one of the three men. Sometime later, she heard a knock on the door. Although a male voice instructed her not to answer the door, she did so and she permitted the police to enter the residence. With her consent, the police searched her residence. About ten minutes after the police and the men left, she received a telephone call from a male, who requested permission to come to her residence to retrieve something that he left there. Ms. Ewing refused to allow him to do so. Instead, she contacted the police, who searched her residence with her consent on May 5, 2004. (N.T. 02/28/06, p. 57–73)

Michael Bender, an officer with the Wilkinsburg Police Department, indicated that he arrested the three men at the Ewing residence, one of whom he identified as the [Appellant]. All three were dressed in black clothing (N.T. 02/28/06, pp. 83–87)

During the course of the investigation of the shooting, two spent shell casings from a .32 caliber handgun were found on the front porch of the Ewing residence and several shell casings (one .32 caliber casing and four .380 caliber casings) were found on Franklin Avenue, which is where the victim was shot. (N.T. 02/28/06, pp. 77, 101–102)

The consensual search of the Ewing residence on May 5, 2004 resulted in the recovery of a .32 caliber Berretta in the basement and a second handgun in a backpack in a second floor bedroom. The Berretta, which had one bullet in the magazine and one bullet in the chamber when it was recovered, was introduced as Commonwealth Exhibit 7. (N.T. 02/28/06, pp. 103–110)

Mark Reynolds, the [Appellant's] cousin, testified that he was with the [Appellant] on the afternoon of May 3, 2004.[4] The [Appellant] asked him to come down the street with him "to get

**4.** Mr. Reynolds stated that his nickname is "Tweed." N.T. 2/28/06–3/2/06 at 158.

into a shoot-out." The [Appellant] had a handgun with him, either a .32 caliber or a .38 caliber. Mr. Reynolds declined to go with the [Appellant]. A short time later, Mr. Reynolds heard several gunshots. After hearing the gunshots, Mr. Reynolds went home, where he received a telephone call from the [Appellant] requesting that he pick him up because he was leaving the police station. Mr. Reynolds drove his vehicle toward the police station and he encountered the [Appellant], "Patch Head", and "LA" walking down the street. All three men got into Mr. Reynolds' vehicle. After dropping "LA" off at a store, the other two men and Mr. Reynolds went to his residence. They began discussing the gunshots. The [Appellant], who indicated that he had a .32 caliber gun, stated that they went to Franklin Avenue and started shooting. He further indicated that he shot a "little boy" that he did not know and they stashed the guns in a house where "Angel" lived. After he stashed the guns, he went to the bathroom and urinated on his hands to clean off the gun powder. After discussing the incident, the [Appellant] and Mr. Reynolds called "Angel" and demanded that she allow them to retrieve the guns. "Angel" refused to permit the men to come back to her house and told them she was going to call the police. (N.T. 02/28/06, pp. 118–132)

Robert Levine, a criminalist with the Allegheny County Medical Examiner's Office, testified that he examined a Bersa .38 caliber semiautomatic pistol (Commonwealth Exhibit 8) and a .32 caliber Berretta pistol (Commonwealth Exhibit 7), along with several bullets and shell casings, including a bullet that was removed from the victim (Commonwealth Exhibit 9). Both handguns were in operable condition and the bullet removed from the victim matched the test bullets that were discharged from the .32 caliber Berretta.... (N.T. 02/28/06, pp. 182–193)

Michael O'Keefe, a detective with the Allegheny County Police Department, testified that he is assigned to jail investigations at the Allegheny County Jail. He indicated that it is jail policy to open and read all letters that are returned to the jail marked 'Return to Sender'. On June 15, 2005, he was given a letter addressed to D. Cunningham that had been returned to the jail marked "Return to Sender. Cunningham, D. moved. Left no address". (Commonwealth Exhibit 10) Detective O'Keefe opened the envelope and found a two-page handwritten letter and an Affidavit of Probable Cause. The letter, which was dated June 3, 2005, was read into evidence by the detective. In essence, it requested that the recipient testify that Mark Reynolds was never with them. (N.T. 02/28/06, pp. 196–203)

Trial Court Opinion filed 11/16/06 at 2–5.

¶ 8 Appellant contends that there was no physical evidence or eyewitness testimony to prove that he shot Victim. He argues that "[t]he chief evidence linking [him] to the shooting was the testimony of [his] cousin, [Mr. Reynolds,] which was so inherently contradictory and unreliable that it could not prove beyond a reasonable doubt that [he] shot [Victim.]" Brief of Appellant at 26.

¶ 9 As set forth above, Mr. Reynolds testified that he was with Appellant on the afternoon in question when Appellant, who was in possession of a firearm, inquired as to whether Mr. Reynolds wanted to walk down the street and participate in a shootout. Mr. Reynolds declined and, shortly thereafter, heard several gunshots. Mr. Reynolds stated that, later that day, he was with Appellant when Appellant in-

formed him that he earlier had fired shots on Franklin Avenue and struck a "little boy." Mr. Reynolds added that, after stashing the gun at Angel's house, he urinated on his hands in an attempt to rid them of gun powder.

■ ¶ 10 Although Appellant contends that the testimony of Mr. Reynolds was unreliable, it is for the fact-finder to make credibility determinations, and the finder of fact may believe all, part, or none of a witness's testimony. *Commonwealth v. Goins,* 867 A.2d 526, 528 (Pa.Super.2004). In this case, the jury was free to accept the testimony of Mr. Reynolds.

¶ 11 In addition, as noted by the trial court, the following notable evidence also was presented: the testimony of Lynette Jackson, who discussed Appellant and two (2) other men entering her mother's home soon after the gunshots were heard; a handgun, which was identified by Mr. Reynolds as that possessed by Appellant, was recovered from the residence of Ms. Jackson's mother; a bullet fired from that handgun was removed from the body of Victim; and a letter written by Appellant to one of the two men who was with him on the day of the shooting.

¶ 12 We find that the above evidence adduced at trial, as well as all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth, was sufficient for the jury, sitting as the finder of fact and examining the evidence in its totality, to conclude that Appellant was guilty of aggravated assault. Therefore, Appellant's challenge to the sufficiency of the evidence is without merit.

¶ 13 Finally, Appellant claims that the trial court erred in allowing the Commonwealth to introduce into evidence the contents of the above-referenced letter. As to our standard of review in this regard, the Supreme Court has stated that:

The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. In determining whether evidence should be admitted, the trial court must weigh the relevance and probative value of the evidence against the prejudicial impact of that evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact.

*Commonwealth v. Reid,* 571 Pa. 1, 34, 811 A.2d 530, 550 (2002) (internal citations omitted).

■ ¶ 14 In the present case, during the course of Appellant's trial, the Commonwealth sought to introduce into evidence the text of a letter written by Appellant while he was incarcerated at the Allegheny County Jail ("ACJ"). The letter, which was addressed to one of the men with Appellant the day of the shooting, *see* N.T. 2/28/06–3/2/06 at 180, was returned to the ACJ, where it was seized by officials. Over an objection by Appellant's counsel, portions of the letter were read into evidence.

¶ 15 In reference to this letter, the Commonwealth presented the testimony of Michael O'Keefe, a detective with the Allegheny County Police, who was assigned to investigations at the ACJ. He testified that, as per the inmate handbook, it is the policy of the ACJ to open, examine, and read the contents of any letter that has been returned to the sender. *Id.* at 197. Detective O'Keefe stated that, on or around June 15, 2005, he was given an envelope by Jim Prokay, who was employed in ACJ mailroom. This envelope was addressed to "D. Cunningham, 1815 Penn Avenue, Number 2, Wilkinsburg, PA 15221" and was stamped "Return to Send-

er, Cunningham, Darian, moved. Moved. Left no address. Return to sender." *Id.* at 200.

¶ 16 Detective O'Keefe indicated that the envelope contained an affidavit of probable cause concerning the crimes committed against Victim and a two-page handwritten letter. The letter, in pertinent part, read as follows:

I need you to come and say that Tweed was never with us. He's saying he picked us up after the shit went down. We can't be charged with nothing because they don't have nothing. That's why I'm the only one charged with this shot.

I need your help bad as [f – – –]. I sent you the paperwork so you can read it yourself. Holler at me and let me know what's good. I go back to court on Thursday, June 9....

. . . .

P.S. Tell mad [motherf – – – – –] to come to the hearing. Hopefully Tweed won't testify if he see niggas. June 9, '05.

*Id.* at 201–202 (quotation marks omitted).

¶ 17 Appellant contends that the court erred in allowing admission of the letter into evidence in that such letter had been seized by prison officials in violation of prison policy, the prohibition against unreasonable searches and seizures, and his fundamental right to privacy. Specifically, he argues that, although prison policy gives prison officials the right to open return-to-sender letters to assure such letters do not contain contraband, this right does not extend to reading the contents thereof.

¶ 18 In the recent case of *Commonwealth v. Moore,* 928 A.2d 1092 (Pa.Super.2007), a panel of this Court addressed the issue of whether a defendant who is incarcerated has a constitutional right to privacy in his non-privileged prison mail. Following thorough analysis of the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution, the Court noted that:

Although prison walls do not separate inmates from their constitutional rights, because of the unique nature and requirements of the prison setting, imprisonment carries with it the circumscription or loss of many significant rights ... to accommodate a myriad of institutional needs ... chief among which is internal security. Prisoners have used the mail to transport contraband into and out of prison, to discuss and participate in ongoing criminal activity, and to coordinate escape plans. An unrestricted privacy interest in non-privileged mail would assist criminal objectives by facilitating the transmission of information. On the other hand, prisoners must appreciate the inherent loss of privacy in a prison, where security and surveillance obviate any legitimate expectation of privacy.

*Id.* at 1102 (quotation marks and internal citations omitted). The Court went on to hold that a prisoner has no constitutional right to privacy in his non-privileged mail.

¶ 19 In the case *sub judice,* we find that the trial court did not abuse its discretion in allowing into evidence the text of Appellant's non-privileged letter that was returned to the ACJ.[5] Thus, his claim predicated on this basis is without merit.

**5.** To the extent Appellant argues that seizure of the letter and an examination of the text thereof violated prison policy, the certified record before us does not contain such alleged policy. *See Commonwealth v. Walker,* 878 A.2d 887, 888 (Pa.Super.2005) (stating that an appellate court is limited to considering only the materials in the certified record

¶ 20 Based on the foregoing, we affirm the judgment of sentence.

¶ 21 Affirmed.

when resolving an issue). In addition, however, Detective O'Keefe testified that, as per the inmate handbook, it is the policy of the ACJ to open, examine, and read the contents of any letter that has been returned to the sender. N.T. 2/28/06–3/2/06 at 197.